# EXHIBIT K

# PURCHASE AGREEMENT

**THIS AGREEMENT** dated 4th day of April, 2011

**BETWEEN:**

**RIDGELINE ENERGY SERVICES INC.,** a corporation duly incorporated under the laws of the Province of Alberta,

(the "Purchaser")

- and -

**DENNIS M. DANZIK**, an individual resident in the Village of Paradise Valley, in the State of Arizona.

(the "Vendor")

- and -

**DANZIK HYDROLOGIC SCIENCES, LLC**, a limited liability company duly organized under the laws of the State of Delaware,

("DHS")

**WHEREAS** the Vendor is the sole inventor, developer of the Intellectual Property and Trade Secrets;

**AND WHEREAS** the Vendor is the owner of one hundred percent of the membership interest in DHS;

**AND WHEREAS** the Vendor wishes to sell and the Purchaser wishes to purchase all of the outstanding interests of DHS on the terms and conditions set forth in this Agreement;

**AND WHEREAS** DHS is a party to this Agreement for the purpose of, among other things, giving certain representations and warranties regarding DHS and its business and facilitating the completion of the transaction;

**NOW THEREFORE** in consideration of the premises and the mutual promises, and in consideration of the representations, warranties and covenants contained in this Agreement, the receipt and sufficiency of which is hereby acknowledged by the parties, the parties hereto agree as follows:

## DEFINITIONS

1) The following terms and expressions shall have, for all purposes of this Agreement, the meaning set out below:

a)      "**Act**" means the *Income Tax Act* (Canada), as amended from time to time;

b)      "**Agreement**" means this agreement and all amendments made to this Agreement by further written agreement among the parties;

c)      "**Assets**" means the Energy Assets and the Water Assets;

d)      "**Assignment**" means the assignment of interests in the DAS to the Purchaser in substantially the form attached hereto Schedule "L"

e)      "**Business Day**" means a day other than a Saturday or Sunday on which Canadian chartered banks are open for the transaction of domestic business in Calgary, Alberta;

f)      "**Closing Date**" means the date that is no later than the 5th business day following receipt of all required regulatory and shareholder approvals, or such other date as the parties may mutually agree upon, but shall be no later than July 1, 2011 unless the Purchaser and Vendor mutually agree to an extension of the Closing Date for up to an additional 60 days beyond July 1, 2011;

g)      "**Commissions**" means the Alberta Securities Commission, British Columbia Securities Commission and the Ontario Securities Commission ;

h)      "**Common Shares**" means the common shares in the capital of the Purchaser, which shares are, as of the date of this Agreement, listed for trading on the facilities of the Exchange;

i)      "**DAS**" means Danzik Applied Sciences, LLC, a limited liability company incorporated under the laws of the State of Delaware and solely controlled by Dennis M. Danzik, the Vendor and the Trustee hereunder;

j)      "**DHS**" means Danzik Hydrologic Sciences, LLC., a private limited liability company duly incorporated pursuant to the laws of the State of Delaware.

k)      "**Development and Supply Agreement**" means the three (3) year agreement between DAS and the Purchaser which will provide priority and exclusive services relating to the manufacture of equipment using the Intellectual Property and research and development on the Assets;

l)      "**Earn Out**" means the formula under which the Earn Out Shares will be issued to the Vendor, as more particularly described in section 3)b);

m)      "**Earn Out Amount**" means the resulting value expressed in dollars under the Earn Out that will be satisfied by the Purchaser through the issuance of the Earn Out Shares, as more particularly described in section 3)b);

n)      "**Earn Out Shares**" means the Common Shares issuable by the Purchaser to the Vendor in exchange that portion of the Purchase Price representing the value of the Energy Assets;

o)    "**Eau Claire Partnership**" means the partnership between Ridgeline Eau Claire Inc., a wholly owned subsidiary of the Purchaser and DAS, and DAS has or will assign its interest in the Eau Claire Partnership to DHS prior to the completion of the transactions contemplated herein;

p)    "**Employee Benefit Plans**" means all bonus, deferred compensation, incentive compensation, share purchase, share option, severance or termination pay, vacation pay, hospitalization or other medical, health and welfare benefits, life or other insurance, dental, eye care, disability, salary continuation, supplemental unemployment benefits, profit-sharing, employee loan, pension, retirement or supplemental retirement benefit plan, arrangement or agreement, including any defined benefit or defined contribution pension plan and any group registered retirement savings plan, and any other similar employee benefit plan, arrangement or agreement, whether oral or written, formal or informal, funded or unfunded, including policies with respect to holidays, sick leave, long-term disability, vacations, expense reimbursements and automobile allowances and rights to company-provided automobiles, that are sponsored or maintained or contributed to or required to be contributed to, by the DHS for the benefit of any of current or former employees of DHS or beneficiaries of any of them, except that the term "Employee Benefit Plans" shall not include any plans or payment obligations with which DHS or the Vendor is required to comply pursuant to applicable law (whether pursuant to statute, common law or equity), including the Canada Pension Plan or plans administered pursuant to applicable provincial health tax, workers' compensation, and employment insurance legislation;

q)    "**Energy Assets**" means those tangible and intangible assets related to the manufacture of fuel and energy as more particularly described in Schedule "C" attached hereto

r)    "**Environmental Law**" means any applicable law relating to the environment or occupational health and safety including those pertaining to: (i) reporting, licensing, permitting, investigating, remediating and cleaning up in connection with any presence or release, or the threat of the same, of hazardous substances; and (ii) the generation, manufacture, processing, distribution, use, re-use, treatment, storage, disposal, transport, labeling and handling of hazardous substances;

s)    "**Environmental Permits**" means all licenses required to be obtained and maintained by DHS, or the Vendor under Environmental Laws in order to conduct its business;

t)    "**Equipment**" means any machinery, equipment, vehicles or tools and any accessories or appurtenances thereto;

u)    "**Equipment Leases**" means any lease in respect of the Equipment to which DHS is a party or has any obligations;

v)    "**Equity Interests**" means all equity interests in DHS including, but not limited to membership profits, ownership, voting, management, economic, rights, title or other interests;

w)      "**Exchange**" means the TSX Venture Exchange;

x)      "**Financing**" means any financing in which the Purchaser raises capital either by an equity financing through the issuance of Common Shares or other shares of the Purchaser, or by debt financing through term loan borrowing. Any debt financing shall specifically exclude the Purchaser's credit lines or any term loans or credit facilities that are secured against the assets of the Purchaser's soil remediation subsidiary Ridgeline GreenFill Inc.;

y)      "**Financial Statements**" means the balance sheet, statements of income, retained earnings and changes in the financial position of DHS for the fiscal period ended March 31, 2011 and the notes to the Financial Statements, all of which are prepared by management of DHS;

z)      "**Intellectual Property**" means intellectual property of whatever nature and kind including all domestic and foreign trade-marks, business names, trade names, domain names, trading styles, all domestic or foreign patents, pending, patents, Trade Secrets, Software, industrial designs and copyrights, whether registered or unregistered, and all applications for registration thereof, and inventions, formulae, recipes, product formulations, processes and processing methods, technology and techniques, know-how and manuals of DHS and the Vendor or as otherwise related to the Assets, but specifically excludes the trade name, or Trademark "Danzik" or any business or trade name with "Danzik" as a part of the name.

aa)     "**IP Counsel**" means the intellectual property and patent counsel representing the Eau Claire Partnership;

bb)     "**IP Escrow Agreement**" means the delivery of the Trade Secret Report to the IP Counsel to be held in escrow by the IP Counsel and release in accordance with the Matriculation;

cc)     "**Laws**" shall mean:
   i)      all constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules, regulation, and municipal by-laws, whether domestic, foreign or international;
   ii)     all judgments, orders, writs, injunctions, decisions, rulings, decrees, and awards of any governmental authority or body; and
   iii)    all policies, practices, and guidelines or any governmental authority or body which, although not actually having force of law, are considered by such governmental authority or body as requiring compliance as if having the force of law,

   in each case binding or affecting the party referred to in the context in which such word is used, and "Law" shall mean any one of them;

dd)     "**LLC Agreement**" means any Limited Liability Company operating agreement or DHS;

ee)     "**Material Adverse Change**" means in excess of $10,000 for a single instance or $25,000 in the aggregate;

ff)     "**Material Contracts**" means the contracts, agreements and arrangements described in Schedule "D" to this Agreement;

gg)     "**Matriculation**" means the methodology which provides for the staged and objective delivery of the Intellectual Property and Trade Secrets to the Purchaser, as more particularly described in section 6);

hh)     "**Patents**" shall mean those patent applications, patents pending or patents of DHS set out in Schedule "J";

ii)     "**Payment Shares**" means collectively the Water Shares and the Earn Out Shares;

jj)     "**Permitted Encumbrances**" means:

   i)     liens for taxes, assessments or governmental charges not yet due or delinquent or the validity of which is being contested in good faith;
   ii)    liens arising in connection with workers' compensation, employment insurance, pension, employment or other social benefits laws or regulations, provided that no amounts are due or delinquent thereunder;
   iii)   undetermined or inchoate liens and charges incidental to construction or current operations which relate to obligations not due or delinquent;
   iv)    liens arising by operation of law such as builders' liens, carriers' liens, materialmens' liens and other liens of a similar nature which relate to obligations not due or delinquent;
   v)     the provisions of the Equipment Leases and Material Contracts; and
   vi)    the Royalty;

kk)     "**Purchase Price**" has the meaning attributed to it in section 3) hereof;

ll)     "**Purchased Interests**" means the entire legal and beneficial right, title, estate, and interest of the Vendor in and to all of the issued and outstanding Equity Interests in DHS;

mm)     "**Person**" shall include individuals, partnerships, associations, trusts, firms, unincorporated organizations and corporations;

nn)     "**Regulatory Approvals**" means the approvals for the transactions contemplated herein required from all regulatory bodies having jurisdiction over same;

oo)     "**Royalty**" has the meaning set out in section 3)c);

pp)     "**Schedules**" this Agreement has the following schedules which are attached hereto and form part of this Agreement:

   Schedule "A" – Purchased Interests of DHS;
   Schedule "B" – Water Assets;
   Schedule "C" – Energy Assets;
   Schedule "D" – Material Contracts;
   Schedule "E" – Employee Disclosure;

    Schedule "F" – Employee Benefit Plans;
    Schedule "G" – Equipment Leases
    Schedule "H" – Licences;
    Schedule "I" – Patents.
    Schedule "J" - U.S. Accredited Investor Certificate
    Schedule "K" - Assignment

qq)    "**Seaway Licence**" means the licence based on the usage of the Intellectual Property relating to the Water Assets. Such licence was originally granted by DEJA II, LLC, a prior owner of certain Intellectual Property owned by the Vendor, to Seaway Manufacturing Inc. specifically for the use of remediating swimming pool waste water, which licence expired on March 31, 2011, and shall not be re-granted, renewed or extended by the Vendor.

rr)    "**Software**" means all software relating to the Assets, including all versions thereof, and all related documentation, manuals, source code and object code, program files, data files, computer related data, field and data definitions and relationships, data definition specifications, data models, program and system logic, interfaces, program modules, routines, sub-routines, algorithms, program architecture, design concepts, system designs, program structure, sequence and organization, screen displays and report layouts, and all other material related to such software.

ss)    "**Tax**" or "**Taxes**" means any and all taxes, fees, levies, duties, tariffs, assessments, reassessments or other chares of any kind imposed by any governmental authority or taxing authority, together with all interest, penalties, fines, losses, damages, liabilities, expenses, additions to tax or additional amounts or costs with respect thereto, including taxes or other charges on or in the nature of income, franchises, concessions, property, capital, interest, capital gains, payroll, employment, social security, workers' compensation; excise, withholding, ad valorem, stamp, transfer, value added, goods and services; license registration or documentation fees, or customs duties, tariffs, or similar charge;

tt)    "**Tax Return**" means any report, return or filing with respect to Taxes;

uu)    "**Termination Fee**" means the fee in the amount of one hundred thousand ($100,000) dollars payable by the Vendor or by the Purchaser in accordance with section 20);

vv)    "**Trade Secrets**" mean all unpatented processes, specifications, know-how, formula, methodologies and all other related confidential information and intellectual property contained or forming part of the Assets that are kept secret and confidential by DHS, the Vendor in order to maintain their proprietary value;

ww)    "**Trade Secret Report**" means the sealed written report of the Trustee that specifically details the Trade Secrets which shall be confidentially and satisfactorily reviewed and held in escrow by the IP Counsel;

xx)    "**Trustee**" means Dennis M. Danzik, the Vendor, and the trustee of the Intellectual Property and Trade Secrets for and on behalf of the Purchaser;

6

yy)   "**Trust Declaration**" means the declaration of trust to be delivered by the Trustee to the Purchaser at the Closing Date under which the Trustee shall hold the Trade Secrets in trust for an on behalf of the Purchaser;

zz)   "**Undisclosed Liabilities**" means any monies owing by, or any liabilities of, DHS to an Person which are not disclosed in the Financial Statements;

aaa)   "**Vendor**" means Dennis M. Danzik;

bbb)   "**Water Assets**" means those tangible and intangible assets related to the treatment of water and production of electrical energy, more particularly described in Schedule "B" attached hereto;

ccc)   "**Water Product**" means the trademark registered in the United States and owned by Dennis M. Danzik, which trademark may be used by the Purchaser in conjunction with the Water Assets as described herein;

ddd)   "**Water Shares**" means the Common Shares issuable by the Purchaser to the Vendor in exchange for that portion of the Purchase Price representing the value of the Water Assets.

The division of this Agreement into Articles and sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.  The terms "this Agreement" and similar expressions refer to this Agreement and not to any particular Article, section or other portion of this Agreement and include any agreement supplemental to this Agreement.  Unless something in the subject matter or context is inconsistent with this Agreement, references in this Agreement to Articles and sections are to Articles and sections of this Agreement.

In this Agreement words meaning the singular number only shall include the plural and vice versa, words meaning the masculine gender shall include the feminine and neuter genders and vice versa.

## TERMS OF PURCHASE

2)   The Vendor agrees to sell, assign, convey, and transfer the Purchased Interests to the Purchaser, and the Purchaser agrees to purchase the Purchased Interests from the Vendor for the Purchase Price, effective as of the Closing Date, on the terms and conditions set out in this Agreement.  The Purchased Interests are held by the Vendor as set out in Schedule "A".  The transfer of the Purchased Interests shall be evidenced by the Assignment in the form attached hereto as Schedule "K";

3)   The Purchase Price will be calculated and paid as follows:

a)   A portion of the Purchase Price shall be payable in exchange for the Water Assets component of the Assets and the Purchaser will issue approximately Thirty Four Million, Five Hundred and Eighty One Thousand, Seven Hundred and Forty Three (34,581,743) Common Shares (the "Water Shares"), being the number of Common Shares representing approximately thirty-five (35%) percent of the issued and outstanding Common Shares as

7

at January 31, 2011 on a fully diluted basis after giving effect to the issuance of the Water Shares. The Water Shares will be delivered to the Vendor on the Closing Date.

    i)   the price per Common Share for the Water Shares will be based on the market price on the day that the Purchaser issues a news release announcing the execution of this Agreement;

b)   A further portion of the Purchase Price shall be payable in exchange for the Energy Assets component of the Assets and the Purchaser will issue, on an earn out basis, up to a maximum twelve million (12,000,000) Common Shares (the "Earn Out Shares") to the Vendor based on the following earn out formula:

    i)   The Earn Out shall be over a three (3) year term from the Closing Date;

    ii)  The Earn Out shall be based on twenty (20%) percent of the trailing average of gross revenues collected by the Purchaser from the sales of all products by the Purchaser derived from the Energy Assets (the "Earn Out Amount");

    iii) The Earn Out Amount, if any, will be calculated at the end of each calendar quarter. Any Earn Out Amount payable shall be paid through the issuance of Earn Out Shares at a deemed price equal to the market price of the Common Shares at the end of such calendar quarter. The Earn Out Shares will be issued and delivered to the Vendor within thirty (30) days following the end of such calendar quarter in which Earn Out Shares are issuable.

c)   As a further portion of the Purchase Price the Vendor shall receive the Royalty in respect of the future use of the Water Assets and Energy Assets by the Purchaser. The Purchaser agrees to pay Vendor the Royalty under the terms and conditions of this Agreement. The Royalty shall be equal to $0.000625 USD for each one (1) U.S. gallon, (one U.S. gallon shall be equal to 3.785 litres) of :

    i)   water treated directly from usage of the Water Assets; or

    ii)  fuel manufactured using the Intellectual Property or Trade Secrets and consumed for the production of electrical, pneumatic, steam, hydraulic, or other use which is derived directly from usage of the Energy Assets (the "Manufactured Fuel"). For greater certainty, this shall not include any non-Manufactured Fuel that may be blended with the Manufactured Fuel.

The Royalty shall be payable until the expiration or termination of all Patents, improvements, continuations, wherever filed, relating to the Intellectual Property, or Trade Secrets.

d)   The Payment Shares shall be issued as fully paid and non-assessable shares duly registered in the name of the Vendor or the Vendor's permitted assigns and the Vendor acknowledges and agrees that the Payment Shares shall be subject to any escrow or resale restrictions imposed by or under either the policies of the Exchange, the Commissions or any other applicable securities laws, rules, instruments or policies in either Canada or the United States of America. The Vendor agrees to be bound by and comply with all Exchange policies and rules, instruments and policies of the Commissions regarding the Payment Shares and to comply with all laws and securities regulations in either Canada

8

or the United States of America in respect of trading of the Payment Shares. The Vendor will execute and deliver a U.S. Accredited Investor Certificate in the form attached hereto as Schedule "J".

4)      It is agreed that any requirement to deposit the Water Shares in escrow by the Exchange or the Commissions may not be acceptable to Vendor.

   a)   In the event that an escrow unacceptable to the Vendor is initially imposed by the Exchange or the Commissions, the Vendor agrees that it will act reasonably and in good faith in: (i) assisting the Purchaser the presenting rationale to the Exchange or the Commissions to reduce or remove the escrow period, and (ii) considering reasonable options and alternative solutions to the escrow before arbitrarily terminating the agreement pursuant to section 4)c);

   b)   If the Purchaser has exhausted all reasonable means of: (i) obtaining escrow terms imposed by the Exchange or the Commissions reasonably acceptable to Vendor; and exploring other alterative solutions reasonably acceptable to the Vendor, the Vendor may terminate this Agreement and the provisions of section 20) respecting the Termination Fee shall not apply to the Vendor.

   c)   Notwithstanding the foregoing, in the event that the Water Shares are not required to be deposited in escrow by the Exchange or the Commissions, the Vendor will agree to deposit the Water Shares into a private escrow with the Purchaser in which the Water Shares will be released as follows: thirty three (33%) percent on the Closing Date; thirty three (33%) percent on the six (6) month anniversary of this Agreement effective date; and the remaining balance on the first year anniversary of this Agreement effective date.

   d)   For greater certainty, under no circumstances shall any escrow on the Water Shares be considered to be released on an "earn out" or "vesting" basis. Rather, all releases of Water Shares under any escrow provisions shall be based on an objective time release schedule.

5)      Subject to the fulfillment of all the terms and conditions hereof, including approval of regulatory authorities, the legal and beneficial title to the Purchased Interests shall transfer and vest in the Purchaser effective as of the Closing Date, and DHS shall hold all right, title and interest in and to the Water Assets and Energy Assets.

## ADDITIONAL TERMS OF PURCHASE

6)      Notwithstanding that the Purchaser will acquire the Purchased Interests on the Closing Date and all, right, title and interest in to the Assets through its ownership of DHS, the Purchaser acknowledges that a component of the Intellectual Property related to and included in the Assets are Trade Secrets. In order to facilitate the secure, staged and objective delivery of the Intellectual Property and Trade Secrets from DHS and the Vendor to the Purchaser, the parties agree to the following Matriculation schedule and methodology. The provisions of the Matriculation shall include, without limitation:

   a)   The Purchaser will appoint the Vendor as the Trustee of the Trade Secrets for and on behalf of the Purchaser. The Vendor hereby agrees to accept the appointment as the Trustee and agrees to hold the Intellectual Property and Trade Secrets in trust for and on

behalf of the Purchaser. The Trustee agrees to enter into a Trust Declaration on or before the Closing Date in respect of the Trade Secrets.

b) On or before May 15, 2011, the Vendor, shall produce the Intellectual Property and the Trade Secret Report and deliver it to the IP Counsel. Upon IP Counsel's satisfactory review of the Trade Secret Report, the IP Counsel shall seal the Trade Secret Report and hold the Trade Secret Report under the provisions of the IP Escrow Agreement.

   i) It shall be a term of the IP Escrow Agreement that the IP Counsel shall be subject to strict non-disclosure and confidentiality provisions relating to the Trade Secrets.

   ii) In the event the Trade Secret Report is incomplete in the opinion of the IP Counsel, acting reasonably, he or she shall notify the Vendor and the Purchaser of the deficiencies. The Vendor shall immediately use his best efforts to complete the Trade Secret Report that permits the true and complete delivery of the Trade Secret in a form and substance that permits the Purchaser to functionally use the Trade Secrets for the purposes for which they were intended.

c) The release of the Trade Secrets shall be based on the following dates or events:

   i) On April 1, 2012 – The release from the IP Escrow Agreement of all Intellectual Property and Trade Secrets related to the trigger assemblies related to the Assets;

   ii) On April 1, 2013 – The release from the IP Escrow Agreement of all Intellectual Property and Trade Secrets related to the reactor vessels related to the Assets;

   iii) On April 1, 2014 – The release from the IP Escrow Agreement of all Intellectual Property and Trade Secrets related to the reactor cores and generator assemblies related to the Assets;

   iv) In the event of an uncured breach of DAS under the Development and Supply Agreement or a termination of Development and Supply Agreement as a result of an act or omission by DAS all Trade Secrets shall be immediately released from the IP Escrow Agreement and DAS shall be obliged to provide specific direction, supervision and instruction (both written and demonstrative) of the use and operation of the Trade Secrets in a timely manner which permits the Purchaser to have the full functional and proper use the Assets acquired hereunder; and

   v) In the event of the death or incapacity of Trustee, all Trade Secrets shall be immediately released from the IP Escrow Agreement and DAS shall be obliged to provide specific direction, supervision and instruction (both written and demonstrative) of the use and operation of the Trade Secrets in a timely manner which permits the Purchaser to have the full functional and proper use the Assets acquired hereunder;

d) The manufacturing of the equipment or components that comprise all or part of the Assets shall also be subject to Matriculation and during the Matriculation period DAS shall have exclusive manufacturing rights, subject to the provisions of the Development and Supply Agreement. The transfer of the manufacturing exclusivity from DAS shall be based on the follow following dates or events:

i) On April 1, 2012 – Purchaser shall be entitled to directly manufacture the trigger assemblies related to the Assets;

ii) On April 1, 2013 – Purchaser shall be entitled to directly manufacture the reactor vessels related to the Assets;

iii) On April 1, 2014 – Purchaser shall be entitled to directly manufacture the reactor cores and generator assemblies related to the Assets;

iv) In the event of an uncured breach of DAS under the Development and Supply Agreement or a termination of Development and Supply Agreement as a result of an act or omission by DAS, the Purchaser shall be entitled to directly manufacture all components and equipment related to the Assets, and DAS shall be obliged to provide specific direction, supervision and instruction (both written and demonstrative) to the manufacture of such components and equipment related to the Assets in a timely manner which permits the Purchaser to have the full functional and proper ability to manufacture all components and equipment related to the Assets;

v) In the event of the death or incapacity of Dennis M. Danzik , the Purchaser shall be entitled to directly manufacture all components and equipment related to the Assets, and DAS shall be obliged to provide specific direction, supervision and instruction (both written and demonstrative) to the manufacture of such components and equipment related to the Assets in a timely manner which permits the Purchaser to have the full functional and proper ability to manufacture all components and equipment related to the Assets; and

vi) Unless the Purchaser becomes entitled to the full manufacturing ability under subsections 6) d) (iv) or (v), the Purchaser shall not subcontract the manufacturing of equipment or components relating to the Assets for a period of seven (7) years from the Closing Date, unless such components are not related to, or require knowledge of, the Trade Secrets.

7) On or before the Closing Date, the Purchaser and DAS will enter into the Development and Supply Agreement under which DAS will provide priority and exclusive services to the Purchaser including, without limitation, the manufacturing engineering, design, research and development and supervision for the processes and equipment to be manufactured for the Purchaser. The Development and Supply Agreement shall among other things provided that:

a) DAS shall exclusively manufacture certain equipment under license for the Purchaser using the Intellectual Property in accordance with the Matriculation; and

b) DAS shall conduct certain research and development on the Intellectual Property underlying the Assets with a view to improving the existing Intellectual Property or developing and inventing new Intellectual Property, all of which shall belong exclusively to the Purchaser;

i) Subsequent to the Closing Date, the Purchaser agrees to fund the research and development on the Intellectual Property being conducted by DAS on behalf of the Purchaser under the Development and Supply Agreement in an amount equal to twenty (20%) percent, up to a maximum of two million ($2,000,000) dollars, of the

first $10,000,000 successfully raised under any Financing by the Purchaser. Thereafter, Purchaser agrees that it will fund the research and development in an amount equal to ten (10%) percent, up to a maximum of three million ($3,000,000) dollars, of any subsequent Financing successfully completed by the Purchaser over and above the first ten million ($10,000,000) dollars of Financing up to thirty million ($30,000,000) of Financing. For greater clarification the Purchaser will pay a maximum of five million ($5,000,000) dollars to the Vendor if an aggregate amount of Financings raised is forty million ($40,000,000) dollars All such funding shall be the research and development expenses of the Purchaser.

c) DAS and its employees, consultants and suppliers shall enter into secrecy and non-disclosure agreements in a form satisfactory to the Purchaser. DAS shall not be entitled to sub-contract the manufacturing of equipment or components relating to the Assets, unless such components are not related to, or require knowledge of, the Trade Secrets, or such other items as may be agreed to by the Purchaser.

d) The Vendor hereby grants to the Purchaser a limited perpetual, royalty-free, world-wide license for the use of Vendor's trademark "Water Product" for consideration of $1.00, the receipt of which is acknowledged by Vendor. The Purchaser agrees to obtain written permission from Vendor for use of such trademark in any publication, presentation, or any other written or electronically transmitted advertisement or information.

## REPRESENTATIONS AND WARRANTIES
## OF THE VENDOR

8) The Vendor represents and warrants to the Purchaser and acknowledges that the Purchaser is relying upon the following representations and warranties:

a) the Vendor has full capacity, power and authority to execute, deliver and perform his obligations under this Agreement, and this Agreement constitutes a valid and legally binding obligation of the Vendor, enforceable in accordance with its terms, subject to the rights of the Vendor's creditors at law and equity;

b) the Vendor need not give any notice to, make any filing with, or obtain any authorization, consent or approval of any government or governmental agency in order to consummate the transaction contemplated by this Agreement;

c) the Vendor is the only legal and beneficial owner of the Purchased Interests and the Purchased Interests now, and at the Closing Date will, constitute all of the issued and outstanding Equity Interests of DHS;

d) the Purchased Interests are free and clear of all security, encumbrances, charges, and other third party rights and interests of every nature and kind including, without limiting the generality of the foregoing, any existing or contingent statutory rights, obligations, liabilities or transfer impediments;

e) there are no outstanding warrants, options, or other rights to acquire the Purchased Interests or any portion of the Purchased Interests, and without limiting the generality of the foregoing, no person has any option or right (whether at law, pre-emptive, contractual, equitable or otherwise) capable of

becoming an agreement to purchase from the Vendor all or any portion of the Purchased Interests;

f)      the execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement and the fulfillment of and compliance with the terms and provisions of this Agreement do not and will not:

  i)      conflict with, result in a breach of, constitute a default under or accelerate or permit the acceleration of the performance required by the LLC Agreement or any agreement, instrument, lease, license, permit or authority to which the Vendor is a party or is subject or by which  the Vendor is bound,

  ii)      result in the creation of any lien, charge or encumbrance or other right in favor of a third party against the Purchased Interests,

  iii)      give to others any material interest or right, including rights of purchase, termination, cancellation or acceleration, or

  iv)      violate any provision of any law, statute or regulation or any judicial, administrative or governmental order, award, judgment, ruling or decree binding on or applicable to the Vendor, the Purchased Interests, or the rights or interests of the Vendor in the Purchased Interests,

g)      there is not, and will not be, as of the Closing Date, any judicial, administrative or governmental action, claim, proceeding, suit or investigation in progress or pending or threatened which may materially affect the value of the Purchased Interests or which may affect the ability of the Vendor to consummate the transactions contemplated by this Agreement;

h)      there are no charges, judgments, orders, writs, decrees or injunctions in existence, contemplated or threatened, against or in respect of the Purchased Interests, or which may affect the ability of the Vendor to consummate the transactions contemplated by this Agreement;

i)      the Vendor has done no act or thing, nor have they omitted to do any act or thing by which the title to, or right or interest of, the Vendor in the Purchased Interests may be cancelled, terminated or in any way diminished;

j)      the Vendor is not obligated to obtain the consent of any person or to provide notice to any person with respect to the transactions contemplated by this Agreement, nor do the transactions contemplated by this Agreement give rise to any rights of first refusal or pre-emptive, preferential or similar rights of purchase; and

k)      the Vendor is a "non-resident" within the meaning of the *Income Tax Act* (Canada).

9)      The Vendor also represents and warrants to the Purchaser and acknowledge that the Purchaser is relying upon the following representations and warranties regarding DHS and the Assets:

13

a) DHS is a duly incorporated and validly subsisting limited liability company in good standing under the laws of the State of Delaware, is duly authorized to conduct its business under the laws of each jurisdiction where it carries on business, and DHS has full corporate power and authority to own and operate its assets and to carry on the business in which it is engaged;

b) the LLC Agreement, if one exists, has been provided to the Purchaser and is the Limited Liability Company agreement of DHS, and there have been no amendments to such agreement and there is no agreement to amend the LLC Agreement, commitment or otherwise;

c) DHS has the full right, power and corporate authority to enter into this Agreement with the Purchaser and the Vendor and to consummate the transaction contemplated by this Agreement;

d) this Agreement has been properly authorized, executed and delivered by DHS and constitutes a legal, valid and binding agreement of DHS, enforceable against DHS in accordance with its terms, subject to the applicable laws of bankruptcy, insolvency, laws that generally affect creditors rights;

e) DHS has been formed solely for the purposes of holding the Assets and that it has not conducted any business operations since the date of formation until the Closing Date;

f) the Purchased Interests constitute all the equity interest in DHS.  All of the Purchased Interests are validly issued, fully paid and non assessable and there are no other securities of any of DHS that are issued and outstanding.  Except for the Purchased Interests, no person has any agreement or option, or any right capable of becoming an agreement or option, for the purchase or issuance of any Equity Interests in DHS or of any other securities of any of DHS convertible into Equity Interests;

g) DHS is the legal and beneficial owner of all of the Assets with good and marketable title thereto, free and clear of all encumbrances whatsoever other than Permitted Encumbrances.  No person has, or has any right capable of becoming, any agreement, option, understanding or commitment for the purchase or other acquisition of the Purchased Interests or any of the Assets;

h) There are no material defects in DHS's title or claim to, or interest in, the Assets, business or undertaking;

i) neither the entering into of this Agreement by DHS, nor the entering into of any agreement or other instrument contemplated hereby nor the completion of the transactions herein contemplated nor the performance by the Vendor of his obligations hereunder will:

    i) conflict with, or result in the breach of or default under, or cause the acceleration of any obligations of DHS under, any of the terms and provisions of: (a) any applicable Laws, (b) the Certificate of Formation of DHS, the LLC Agreement, any by-laws or operating provisions of

DHS or any resolution of its managers or members; or (c) any contract or agreement to which DHS is a party or by which they are bound, or any license held by DHS which is necessary for the conduct of its business;

ii) relieve any other party to any Material Contract or any Equipment Lease of that party's obligations thereunder or enable it to terminate its obligations thereunder; or

iii) result in the creation of any lien or encumbrance on any of the Assets;

j) no regulatory approval or registration or filing with, notice to, or waiver from, any governmental authority is required to be obtained or made by the Vendor or DHS in connection with the execution, delivery and performance by the Vendor of his obligations under this Agreement;

k) Schedule "E" contains, as at the date hereof, the names and titles or positions of the managers, project foremen, and office staff for each of DHS, and their date of hire, a list of all written contracts with these employees, a summary of the terms of all oral contracts with these employees, and the remuneration of, and Employee Benefit Plans applicable to, each of these employee. Schedule "E" also contains a list of all other persons receiving, as at the date hereof, compensation for work or services provided to DHS who are not employees and particulars of their terms of engagement. Schedule "E" also contains, as at the date hereof, a list of all employees who are absent from work including, without restriction, employees on lay off, or who are off work and in receipt of or awaiting long term or short term disability benefits, or on a leave of absence, or off work and in receipt of or awaiting workers' compensation benefits;

l) DHS is in compliance with all application employment legislation in any jurisdiction in which DHS carries on its business. There are no outstanding wages, compensation or benefits owing to employees, other than in the ordinary course of business. All material levies, assessments and penalties made against DHS under any employment legislation have been paid in full. To the Vendor's knowledge, there is no complaint, claim, proceeding or unfair labour practice charge or similar complaint under any employment legislation against DHS pending or threatened before any governmental authority;

m) except as set out in Schedule "F", DHS does not hold pension plans, deferred compensation plans, retirement income plans, stock option or stock purchase plans, profit sharing plans, bonus plans or policies, employee group insurance plans, hospitalization plans, disability plans and other employee benefit plans, programs, policies and practices, formal or informal, with respect to its employees;

n) DHS is not subject to any agreement with any labor union or employee association and have not made any commitment to or conducted negotiations with any labor union or employee association with respect to any future agreement and, to the knowledge of the Vendor, there are no current attempts to organize, certify or establish any labor union or employee association, in relation to any of the employees of DHS;

o)   there is no employee who cannot be dismissed on reasonable notice except as provided under the employment contracts set forth in Schedule "E". To the Vendor's knowledge no claim is outstanding or has been threatened against DHS by any current or former employee for damages respecting wrongful dismissal or pursuant to any Employee Benefit Plan;

p)   the Equipment Leases listed or identified on Schedule "G" are the only leases of personal property to which DHS is a party or under which DHS has rights. All of the Equipment Leases are in full force and effect and no material default exists on the part of DHS or, to the knowledge of the Vendor, on the part of any of the other parties thereto. All payments due under the Equipment Leases have been duly and punctually paid and all material obligations to be discharged or performed under the Equipment Leases have been fully discharged and performed in accordance with the terms of the Equipment Leases;

q)   since the date of formation of DHS there has been no material change in the condition or value of the Assets and the Assets used in the business of DHS are in good operating condition and in a state of good repair and maintenance, reasonable wear and tear excepted;

r)   DHS is not a party to or bound by or subject to any  agreement, contract or commitment, written or oral, of any nature or kind relating to the business of DHS that have or may result in any liabilities, except for:

   i)   the Equipment Leases;

   ii)   agreements and arrangements with respect to the employees of DHS, the Employee Benefit Plans and persons receiving compensation for work or services provided to the Vendor or DHS as set forth and described in Schedule "F";

   iii)   the Permitted Encumbrances;

   iv)   the Material Contracts, and

   v)   quotes for goods or services of DHS, not yet accepted by the recipient of the quote;

s)   the Material Contracts are all in good standing and in full force and effect with no amendments except as disclosed on Schedule "D". The copies of all Material Contracts, including any amendments thereto or extensions thereof, made available to the Purchaser for inspection are true and complete copies of the originals and all of the Material Contracts and such amendments and extensions are valid and binding obligations of the parties thereto enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and rules of equity. DHS have complied in all material respects with all terms of the Material Contracts, have paid all amounts due thereunder, have not waived any rights thereunder which could reasonably be expected to have a material adverse effect on DHS, and no material default or breach exists in respect thereof on the part of any of the parties thereto and no event has occurred which, after the giving of

16

notice or the lapse of time or both, would constitute such a material default or breach. All amounts, if any, currently payable to DHS under the Material Contracts are due and owing and to the knowledge of the Vendor DHS has not received any notice whereby the counterparty to a Material Contract has purported to exercise any right of set-off. Schedule "D" also sets forth all material quotations, orders or tenders for contracts submitted by DHS which remain open for acceptance and which, upon acceptance, would constitute a binding agreement;

t)      no a notice or claim for warranties, repairs or maintenance which remains outstanding has been received in respect of the Assets, nor is DHS nor, to the Vendor's knowledge, any prior owners of the Assets, required to provide any performance bonds or other financial security arrangements in connection with any transactions with any of its customers or suppliers which have not, as at the date hereof, not been supplied;

u)      at the Closing Date DHS shall have no debts or liabilities whatsoever;

v)      Schedule "H" lists and describes all licenses (the "Licenses") held by DHS which are required to be obtained by a governmental authority in order for that DHS to conduct its business or use, operate or manufacture or sell the Assets. All Licenses are valid and subsisting and in good standing and there is no material default thereunder.

w)      DHS has conducted and is conducting it business in compliance in all material respects with all applicable laws, rules and regulations. DHS or, to the Vendor's knowledge, any prior owners of the Assets, have not received any notice, written or oral, asserting non-compliance in any material respect with any applicable Laws. To the Vendor's knowledge, there are no pending or threatened, administrative, judicial, investigative, inspection or other proceedings by any governmental authority involving DHS or the Assets;

x)      to the Vendor's knowledge, DHS or, to the Vendor's knowledge, any prior owners of the Assets, have not received:

        i)      any orders or directives from any governmental regulatory body which relate to environmental liabilities and which require any work, repairs, construction or capital expenditures resulting for the Assets where such order or directives have not been complied with in all material respects;

        ii)     written notice of any environmental liabilities which require any work or repairs, construction or capital expenditures resulting for the Assets which have not been complied with in all material respects;

y)      DHS carries on its business and operate and maintain the Assets in compliance with all Environmental Laws and, to the knowledge of the Vendor, there are no facts that could give rise to a notice of non-compliance by DHS with respect to any Environmental Law that would have a material adverse effect on DHS or the Assets;

z)   To the Vendor's knowledge, no Environmental Permits are required to be held by it to operate its business and to own, use and operate the Assets.

aa)   the Financial Statements of DHS:

   i)   are in accordance with the books and accounts of DHS;

   ii)   are true and correct and present fairly the financial position of DHS;

   iii)   have been prepared in accordance with generally accepted accounting principles consistently applied, and

   iv)   present fairly all of the assets and liabilities of DHS, including, without limitation, all contingent liabilities of DHS;

bb)   since the date of formation of DHS, DHS has not:

   i)   had any Material Adverse Change in the business operations, properties, assets or conditions financial or otherwise from that shown in the Financial Statements;

   ii)   paid any dividend or otherwise made any distribution of any kind or nature whatsoever to any of its shareholders as such or taken any corporate proceedings for such purpose;

   iii)   redeemed, purchased or otherwise retired any of its Interests or otherwise reduced its stated capital;

   iv)   subjected any of its assets, or permitted any of its assets to be subjected, to any mortgage, charge, encumbrance or right in favour of any person;

   v)   acquired, sold, leased or otherwise disposed of or transferred any assets other than in the ordinary and customary course of business;

   vi)   entered into or become bound by any contract, agreement, transaction or arrangement, written or oral, that was either not in the ordinary and customary course of its business, or that involved or which may result in the payment of money by DHS in an amount in excess of $5,000;

   vii)   modified, amended or terminated any contract, agreement, transaction or arrangement to which it is or was a party, or waived, relaxed or released any right which it has or had, other than in the ordinary and customary course of its business;

   viii)   incurred any debt, liability or obligation for borrowed money, or incurred any other debt, liability or obligation except in the ordinary and customary course of its business;

   ix)   issued, sold or become liable on any share or debt obligation;

   x)   issued any other forms of Equity Interests;

xi)    agreed or offered to do any of the things described in this subsection;

cc)    between the date of this Agreement and the Closing Date, DHS will not do any of the things described in subsection 9 (bb) without the prior written consent of the Purchaser;

dd)    DHS is not liable to the Workers' Compensation Board or any other agency, board or department for any amounts other than those amounts accrued and payable in the ordinary course of business operations;

ee)    DHS is not a party to any agreement or commitment to acquire any subsidiary business, operation or assets;

ff)    DHS has no banks, trust companies, and other financial institutions at which DHS maintains accounts of any nature or safe deposit boxes, and the names of all persons or entities currently authorized to make withdrawals therefrom or have access thereto;

gg)    DHS has not guaranteed the obligations of any other person (including any corporation);

hh)    Schedule "I" sets forth an accurate and complete list of all Patents held by DHS, and all Patents are owned solely by DHS and there are no royalty or license agreements between DHS and any third parties in respect of the Patents other than the Seaway License. Any registered Patents are either duly registered in United States of America and are in good standing and all associated maintenance fees have been paid to date. The Patents do not infringe on the intellectual property rights of any other third parties. Any Patent applications or Patents pending have been duly filed with the U.S. Patent Office will all fees paid up to date. All such Patents shall be transferred and assigned to the Purchaser on the Closing Date;

ii)    all Intellectual Property comprising the Assets is are valid and subsisting and held by the DHS with good and marketable title and are in good standing free and clear of all security interests, claims, liens, objections and infringements of every nature and kind and any requisite registrations therefore have been kept renewed and are in full force and effect.  DHS is the owner of all Intellectual Property that comprise the Assets, and the use, operation, manufacture or sale by DHS of the Intellectual Property do not involve infringements or claimed infringement of any patent pending, patent, trade-mark, trade name or copyright or otherwise or violate the intellectual property rights of other Persons. No other Person owns, directly or indirectly in whole or in part, any Intellectual Property that comprises the Assets, other than the Seaway License.

jj)    no person holds a general or special power of attorney from any of DHS or over any financial or Asset of DHS;

kk)    DHS is in good standing with all applicable taxing authorities and:

    i)    has duly and timely filed all Tax Returns required to be filed by it, has made and remitted as required or desirable deductions or withholdings at source and has collected and/or paid in full all taxes, duties, levies, assessments, reassessments, penalties, interest and fines which are collectable, due and/or payable by it;

    ii)    all Tax Returns filed by DHS accurately reflect, and do not in any respect understate, the taxable income or the liability for Taxes (including goods and services tax) for DHS in the relevant tax year or calendar year;

    iii)    there are no actions, suits, proceedings, investigations or claims pending or threatened against DHS in respect of taxes, governmental charges or assessments, nor are any matters under discussion with any governmental authority relating to Taxes, governmental charges or assessments, and there are no agreements, waivers or other arrangements providing for an extension of time with respect to the filing of any Tax Return;

    iv)    DHS has withheld from each payment made to any of its present and former officers, directors and employees the amount of all Taxes and other deductions required to be withheld therefrom and has paid the same to the proper tax or other receiving officers within the time periods required under any applicable legislation; and

    v)    to the knowledge of the Vendor's no taxing authority has a claim against the Assets in respect of any unpaid Taxes, duties, levies, assessments, reassessments, penalties, interest or fines.

ll)    DHS is a "private issuer" within the meaning of the National Instrument 45-106 *Prospectus and Registration Exemptions*; and

mm)    all the acts of the directors, officers, managing members or members of DHS have been duly authorized by all necessary corporate proceedings, and DHS is not in contravention of any law, statute, rule, regulation, order, award, judgment, ruling or decree.

10)    The representations and warranties of the Vendor contained in section 8) and section 9) are for the benefit of the Purchaser, and the Vendor shall give the Purchaser notice of any facts which may give rise to a claim under section 8) and section 9) with reasonable diligence after such facts come to the attention of the Vendor

11)    The representations and warranties contained in section 8) and section 9) shall be true and correct on the Closing Date as if made on the Closing Date and shall survive the Closing Date and remain in full force and effect for the benefit of the Purchaser for a period of two (2) years after the Closing Date.

12)    The representations and warranties contained in section 8) and section 9) shall be deemed to apply to and be contained in all conveyances, assignments, transfers and other documents delivered by the Vendor in connection with the transactions contemplated by this Agreement.

## REPRESENTATIONS AND WARRANTIES
## OF THE PURCHASER

13)     The Purchaser represents and warrants to the Vendor and acknowledges that the Vendor is relying upon the following representations and warranties:

a)      the Purchaser is a duly incorporated, validly subsisting corporation in good standing under the laws of Alberta and has the requisite corporate power and authority to own its assets and to conduct its business as it is now being conducted and it is also duly qualified to carry on business in each jurisdiction in which the nature of its business makes such qualification necessary;

b)      the execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement and the fulfillment of and compliance with the terms and provisions of this Agreement do not and will not:

i)      conflict with, result in a breach of, constitute a default under or accelerate or permit the acceleration of the performance required by any agreement, instrument, lease, license, permit or authority to which the Purchaser is a party or is subject or by which  the Purchaser is bound,

ii)     give to others any material interest or right, including rights of purchase, termination, cancellation or acceleration, or

iii)    violate any provision of any law, statute or regulation or any judicial, administrative or governmental order, award, judgment, ruling or decree binding on or applicable to the Purchaser,

c)      this Agreement has been properly authorized, executed and delivered by the Purchaser and constitutes a legal, valid and binding agreement of the Purchaser, enforceable against the Purchaser in accordance with its terms, subject to the applicable laws of bankruptcy, insolvency, laws that generally affect creditors rights and any orders of the Exchange or Commissions;

d)      there is not, and will not be, as of the Closing Date, any judicial, administrative or governmental action, claim, proceeding, suit or investigation in progress or pending or threatened which may materially affect the value of the Common Shares or which may affect the ability of the Purchaser to consummate the transactions contemplated by this Agreement;

e)      there are no charges, judgments, orders, writs, decrees or injunctions in existence, contemplated or threatened, against or in respect of the Purchaser, or which may affect the ability of the Purchaser to consummate the transactions contemplated by this Agreement;

f)      as at the date hereof the Purchaser has an authorized capital consisting of an unlimited number of common shares without par value, of which 50,199,763 Common Shares are issued and outstanding as fully paid and non-assessable. The Purchaser currently has outstanding 9,418,174 warrants to purchase Common Shares and 4,604,500 options to purchase Common Shares. On fully diluted basis

the Purchaser would have 64,223,237 Common Shares issued and outstanding as at the date hereof;

g)      the Purchaser does not have any outstanding agreements, subscriptions, warrants, options or commitments, nor have any of them granted any rights or privileges capable of becoming an agreement, subscription, warrant, option or commitment, obligating the Purchaser to issue any additional Interests or other securities except as disclosed above;

h)      the Common Shares are listed for trading on the facilities of Exchange and the Purchaser has not received notice of and is not aware of any default of policies, rules or by-laws of the Exchange;

i)      the Purchaser is a reporting issuer in the Provinces of British Columbia, Alberta and Ontario and is not in default as a reporting issuer in any of these Provinces.

j)      the Payment Shares to be issued to the Vendor pursuant to section 3 will be validly created, and, subject to any restrictions imposed by Exchange, upon transfer of the Purchased Interests to the Purchaser in accordance with the provisions of this Agreement, such Payment Shares will be:

   i)      duly and validly issued as fully paid, non-assessable shares, and

   ii)     issued in accordance with prospectus and registration exemptions contained in the National Instrument 45-106 *Prospectus and Registration Exemptions*;

k)      the audited financial statements of the Purchaser for the fiscal year ended March 31, 2010 and the unaudited financial statements for the nine month period ended December 31, 2010 present fairly the financial condition and results of operations of the Purchaser on a consolidated basis for the respective periods indicated in such financial statements and have been prepared in accordance with Canadian generally accepted accounting principles applied on a consistent basis, except as otherwise stated in the notes to such financial statements;

l)      since December 31, 2010 there has been no material adverse change in the business, operations, properties, assets of condition, financial or otherwise, of the Purchaser from that shown in the unaudited financial statements of the Purchaser nine month period ended December 31, 2010;

m)      the Purchaser has no liability or obligation including without limitation, tax liabilities, whether accrued, absolute, contingent or otherwise, not reflected in unaudited financial statements of the Purchaser nine month period ended December 31, 2010, except for the liabilities and obligations incurred in the ordinary course of business since December 31, 2010, which liabilities and obligations are not materially adverse in the aggregate;

n)      there are no material actions, suits, proceedings, investigations or outstanding claims or demands, whether or not purportedly on behalf of the Purchaser instituted, pending, or, to the knowledge of the Purchaser threatened against or affecting the Purchaser at law or in equity or before or by any governmental

department, commission, board, bureau, agency or instrumentality, domestic or foreign, or before any arbitrator, nor is there any judgment, order, decree or award of any court or other governmental authority having jurisdiction, obtained, pending or, to the knowledge of the Purchaser threatened, against the Purchaser which would prevent or materially hinder the consummation of the transactions contemplated by this Agreement;

o)  since its incorporation the Purchaser has not declared or paid any dividends or made any distribution of its property or assets to its shareholders nor has it disposed of any of its properties or assets or incurred any material indebtedness, other than those liabilities reflected in the unaudited financial statements of the Purchaser nine month period ended December 31, 2010, except in the ordinary course of business;

p)  the business of the Purchaser is being conducted in all material respects in compliance with all applicable laws, regulations and ordinances of all authorities having jurisdiction;

q)  each contract or agreement between the Purchaser and any other person which is material to the ownership, use or operation of material portion of the business, properties or assets of the Purchaser is in full force and effect and, to the best of the knowledge of the Purchaser, is valid, binding and enforceable against each of the parties hereto, in accordance with its terms and no material breach or default exists in respect thereof on the part of any party thereto and no event has occurred which, with the giving of notice or the lapse of time or both, would constitute such material breach or default;

r)  the Purchaser has full right, power and authority to enter into this Agreement with the Vendor and to consummate the transaction contemplated by this Agreement;

s)  the Purchaser is not a "non-resident" of Canada within the meaning of the Act; and

t)  the Purchaser is not a "non-Canadian" within the meaning of the *Investment Canada Act*.

14)  The representation and warranties of the Purchaser contained in section 13) are for the benefit of the Vendor and the Purchaser shall give the Vendor written notice of any facts which may give rise to a claim under section 13) with reasonable diligence after such facts come to the Purchaser's attention.

15)  The representations and warranties contained in section 13) shall be true and correct on the Closing Date and shall survive the Closing Date and remain in full force and effect for the benefit of the Vendor for a period of two (2) years after the Closing Date.

## COVENANTS OF THE VENDOR

16)  The Vendor agrees to work in good faith and provide full cooperation with the Purchaser in respect of the writing of any new patent applications or the prosecution of any existing

patent applications that exist or arise from DAS's provision of services under the Development and Supply Agreement or otherwise arising from the Assets.

17) The Vendor, DHS, DAS and any entities related thereto that may hold an interest in the Assets shall cease and not conduct any further negotiations, discussions, nor receive or entertain any offers from or with any prospective purchaser of the Purchased Interests, the Assets or their respective businesses.

18) Where recommended by the IP Counsel, at the option of the Purchaser the Vendor shall cause DHS to file patent applications in respect of the Intellectual Property or Trade Secrets.

19) In respect of the independent valuation and due diligence of DHS and the Assets, the Vendor, and DHS shall cooperate in a timely manner and give the Purchaser and the Purchaser's management personnel, legal counsel, accountants, and technical and financial advisors, full and unrestricted access and opportunity to inspect, investigate and audit the books, records, contracts, and other documents of DHS and all of Assets, except for the Trade Secrets which shall be managed in accordance with the Matriculation.

20) The Termination Fee shall be payable within three (3) days of the intended Closing Date by:

    a) the Vendor in the event that all of the conditions of the Vendor as set out in section 43) have been satisfied or waived and the Vendor is unable or unwilling to complete the sale of the Purchased Interests as contemplated herein; or

    b) the Purchaser in the event that all of the conditions of the Purchaser as set out in section 40) have been satisfied or waived and the Purchaser is unable or unwilling to complete the sale of the Purchased Interests as contemplated herein.

21) In the event the transactions contemplated under this Agreement do not receive regulatory approval from the Exchange or any necessary shareholder approval, the Vendor agrees to propose to the Purchaser a reverse take-over transaction in which the Purchaser will be acquired by a NASDAQ listed company on terms acceptable to the Purchaser and the Vendor.

22) The Vendor agrees to indemnify and save harmless the Purchaser and DHS against:

    a) any and all claims, actions, causes of action, liabilities, losses, damages, costs, charges, expenses, Taxes, legal fees and disbursements (on a solicitor and his own client basis), fines and penalties which the Purchaser may suffer, incur, or be liable for, directly, or indirectly, in consequence of a breach of any of the representations and warranties of the Vendor contained in section 8) and section 9);

    b) any claims, liabilities, and actions, causes of action, liabilities, losses, damages, costs, charges, expenses, Taxes, legal fees and disbursements (on a solicitor and his own client basis), fines, or penalties arising from the Assets or the actions of the Vendor or DHS at any time prior to the Closing Date and which are imposed upon the Purchaser or DHS under or by virtue of the laws of any jurisdiction;

c)      Indemnification procedure: If any matter or thing shall be claimed against any person in respect of which indemnity is provided herein, such person (the indemnified party) will notify in writing the person who provided the indemnity (the indemnifying party) of the nature of the claim. Further the indemnified party shall give prompt written notice to the indemnifying party of any written or oral notice or inquiry, notice of assessment, or notice of reassessment received from a taxing authority and relating to a matter that may give rise to a claim for indemnity under this clause The indemnifying party shall be entitled (but not required) at its expense to represent the interests of DHS in any tax audit or administrative or court proceeding relating to fiscal years of DHS ending on or prior to the Closing Date or with respect to any other matter which may give rise to a claim for indemnity under this clause if including settlement or other disposition thereof; and

d)      The amount of any indemnification due for tax claims pursuant to this section shall be net of the present value of any tax benefits resulting from the reassessment and any such claim for indemnity, and include the amount necessary to hold the indemnified party harmless after tax.

23)    The indemnities contained in section 22) shall survive the Closing Date and remain in full force and effect after the Closing Date for a period of two (2) years.

24)    The Vendor agrees that the Purchaser may, without releasing the Vendor from his obligations under section 22) and without modifying same in any way, deal with any or all such claims, actions, causes of action, liabilities, losses, damages, costs, charges, expenses, legal fees and disbursements (on a solicitor and his own client basis), fines and penalties in such manner as the Purchaser may deem appropriate, in the Purchaser's absolute discretion.

25)    The Vendor shall be liable for all costs and expenses, specifically including legal fees and disbursements on a solicitor and his own client basis, which the Purchaser may suffer or incur from time to time in enforcing the provisions of this Agreement.

26)    All charges, fees, commission, expenses or other remuneration payable to brokers, agents or other intermediaries who acted for the Vendor in connection with the transactions contemplated by this Agreement shall be for the sole account of and be paid by the Vendor and not DHS.

27)    On or before the Closing Date, the Vendor shall deliver the following to the Purchaser:

a)      the Trade Secret Report;

b)      the Trust Declaration duly executed;

c)      the IP Escrow Agreement duly executed;

d)      the Development and Supply Agreement duly executed;

e)      duly executed secrecy and non-disclosure agreements in a form satisfactory to the Purchaser from the Vendor and DAS;

f)      all assignments and transfers of Patents required from the Vendor or DHS;

g)      the Assignment duly executed in favour of the Vendor, and amending the registration of DHS and the LLC Agreement to designate the Vendor as the sole member of DHS;

h)      a certified resolution of the managing member of DHS approving the transfer and assignment of the Purchased Interests to the Purchaser by the Vendor, duly executed by an authorized officer of DHS as of the Closing Date;

i)      a duly executed consent of the spouse of the Vendor;

j)      if requested by the Purchaser, duly executed resignations from the Vendor in his capacity as managing director or member of DHS;

k)      if requested by the Purchaser, appropriate certification from the Vendor evidencing the Vendor's eligibility for a zero rate of withholding tax for the Payment Shares and Royalty;

l)      receipts for the share certificates for Water Shares referred to in section 3); and

m)      such further and other documents or resolutions as may be necessary or desirable to duly transfer the Purchased Interests to the Purchaser in accordance with the intent of this Agreement.

28)     The Vendor shall from time to time after Closing Date, at the request of the Purchaser but without further consideration, execute and deliver all such further and additional instruments, notices, releases, and documents and do and perform all such further acts and things as may be necessary or desirable to fully carry out the intent of this Agreement.

### COVENANTS OF THE PURCHASER

29)     The Purchaser agrees to evaluate in good faith the merits of an application to list the Common Shares on NASDAQ, and unless there are compelling reasons or impediments, financial, regulatory or otherwise, such consideration will be made with a view to list on NASDAQ within 24 months after the Closing Date or at such other time as the Purchaser meets the minimum listing requirements for a NASDAQ listing;

30)     The Purchaser agrees to work towards developing a new corporate identity and branding that will enhance the ability to obtain trademark the Purchaser's current environmental and water treatment services as well as any new energy technologies and services.

31)     The Purchaser agrees that within thirty (30) days of the Closing that Purchaser will change the name of DHS to a name that does not contain the trade name "Danzik" or otherwise dissolve DHS.

32)     The Purchaser agrees that it will not use the name, trade name or attempt to secure a trademark using the name "Danzik".

33)     The Purchaser agrees to indemnify the Vendor against:

a) any and all claims, actions, causes of action, liabilities, losses, damages, costs, charges, expenses, Taxes, legal fees and disbursements, fines and penalties which the Vendor may suffer, incur, or be liable for, directly, or indirectly, in consequence of a breach of any of the representations and warranties of the Purchaser contained in section 13);

b) any and all claims, actions, causes of action, liabilities, losses, damages, costs, charges, expenses, legal fees and disbursements, fines and penalties, arising from actions of the Purchaser at any time after to the Closing Date and which are imposed upon the Vendor under or by virtue of the laws of any jurisdiction;

c) Indemnification procedure: If any matter or thing shall be claimed against any person in respect of which indemnity is provided herein, such person (the indemnified party) will notify in writing the person who provided the indemnity (the indemnifying party) of the nature of the claim. Further the indemnified party shall give prompt written notice to the indemnifying party of any written or oral notice or inquiry, notice of assessment, or notice of reassessment received from a taxing authority and relating to a matter that may give rise to a claim for indemnity under this clause The indemnifying party shall be entitled (but not required) at its expense to represent the interests of DHS in any tax audit or administrative or court proceeding relating to fiscal years of DHS ending on or prior to the Closing Date or with respect to any other matter which may give rise to a claim for indemnity under this clause if including settlement or other disposition thereof; and

d) The amount of any indemnification due for tax claims pursuant to this section shall be net of the present value of any tax benefits resulting from the reassessment and any such claim for indemnity, and include the amount necessary to hold the indemnified party harmless after tax;

34) The indemnities contained in section 33) shall survive the Closing Date and remain in full force and effect after the Closing Date for a period of two (2) years.

35) The Purchaser agrees that the Vendor may, without releasing the Purchaser from its obligations under section 33) and without modifying same in any way, deal with any or all such claims, actions, causes of action, liabilities, losses, damages, costs, charges, expenses, legal fees and disbursements (on a solicitor and his own client basis), fines and penalties in such manner as the Vendor may deem appropriate, in the Vendor's absolute discretion.

36) The Purchaser shall be liable for all costs and expenses, specifically including legal fees and disbursements on a solicitor and his own client basis, which the Vendor may suffer or incur from time to time in enforcing the provisions of this Agreement.

37) All charges, fees, commission, expenses or other remuneration payable to brokers, agents or other intermediaries who acted for the Purchaser in connection with the transactions contemplated by this Agreement shall be for the sole account of and be paid by the Purchaser.

38)   On or before the Closing Date, the Purchaser shall deliver the following to the Vendor:

    a)   the IP Escrow Agreement duly executed;

    b)   the Development and Supply Agreement duly executed;

    c)   duly executed secrecy and non-disclosure agreements in a form satisfactory to the Purchaser from the Vendor and DAS;

    d)   a certified copy of the resolutions of the directors and the shareholders of the Purchaser authorizing the transactions contemplated by this Agreement duly executed by an authorized officer of the Purchaser;

    e)   an officer's certificate of the Purchaser (or such other evidence satisfactory to the Vendor) confirming all necessary regulatory approvals for the transactions contemplated by this Agreement;

    f)   share certificates of the Purchaser representing the Water Shares of the Purchaser, registered in the name of the Vendor and in the amounts as determined in accordance with section 3); and

    g)   receipt for Purchased Interest.

39)   The Purchaser shall from time to time after Closing Date, at the request of the Vendor but without further consideration, execute and deliver all such further and additional instruments, notices, releases and documents and do and perform all such further acts and things as may be necessary or desirable to fully carry out the intention of this Agreement.

## CONDITIONS TO THE OBLIGATIONS
## OF THE PURCHASER

40)   The obligations of the Purchaser to complete the transactions contemplated by this Agreement and the obligations of the Purchaser under this Agreement shall be subject to the fulfillment on or before Closing Date of the following conditions:

    a)   Satisfactory determination by the Purchaser that DHS has obtained all the right, title and interest in and to the Assets on or before April 30, 2011;

    b)   If recommended by the IP Counsel, the Vendor shall have prepared patent applications in respect of the Intellectual Property and Trade Secrets on or before June 15, 2011, which date may be extended in the Purchaser's sole discretion;

    c)   The Vendor shall have completed the Trade Secret Report and delivered it to the IP Counsel on before June 15, 2011;

    d)   The satisfactory completion of due diligence investigation by the Purchaser of DHS and the Assets on or before April 30, 2011;

    e)   The Purchaser shall have obtained an independent valuation on DHS. and/or the Assets to the satisfaction of the Purchaser, and acceptable to the Exchange, that supports the valuation to be paid by the Purchaser for the Purchased Interests on

or before March 31, 2011;

f)  At the Closing Date the Purchaser shall be satisfied with the commissioning of the first commercial facility of the Water Assets in respect of projected energy use per cubic meter of water, consumables (catalysts) in dollars per cubic meter cost, flow rates per cubic meter of water;

g)  At the Closing Date there must be no pending or threatened material claims or litigation involving DHS or the Assets, and no material adverse change in the application or use of the Assets;

h)  At the Closing Date DHS will hold only the Assets and will have no debts, liabilities or obligations whatsoever;

i)  At the Closing Date the Purchaser shall have obtained all necessary regulatory approvals from the Exchange or any other regulatory body having authority for the acquisition of the Purchased Interests, the issuance of the Payment Shares and the other transactions contemplated hereunder;

j)  At the Closing Date the Purchaser shall have obtain all necessary approvals from the Purchaser's shareholders for the acquisition of the Purchased Interests, issuance of the Payment Shares and the other transactions contemplated hereunder;

k)  At the Closing Date each of the representations and warranties of the Vendor contained in section 8) and section 9) shall be true and correct as at the Closing Date and the Vendor shall deliver a certificate confirming such;

l)  All documents, instruments and assurances required to be delivered to the Purchaser by the Vendor pursuant to section 27) shall have been delivered on or prior to Closing Date;

m)  At the Closing Date the Vendor and/or DHS shall have assigned all patents, patent applications or patents pending related to the Assets to the Purchaser;

n)  At the Closing Date the Trustee, the IP Counsel and the Purchaser shall have entered into the IP Escrow Agreement based on terms and conditions mutually acceptable to the parties, including, without limitation, the terms generally described herein;

o)  At the Closing Date the Trustee shall have entered into the Trust Declaration based on terms and conditions mutually acceptable to the parties, including, without limitation, the terms generally described herein;

p)  At the Closing Date DAS shall have entered into the Development and Supply Agreement with the Purchaser based on terms and conditions mutually acceptable to the parties, including, without limitation, the terms generally described herein;

q)  At the Closing Date the Purchaser shall appoint to its Board of Directors two (2) eligible director nominees of the Vendor acceptable to the Exchange; and

r)    At the closing date the Vendor shall have executed and delivered a U.S. Accredited Investor Certificate.

41)    The conditions set out in section 40) have been inserted for the benefit of the Purchaser. If any of the conditions set out in section 40) shall not have been fulfilled on or prior to Closing Date, the Purchaser may rescind this Agreement by notice to the Vendor and in such event the Purchaser shall be released from all of its obligations under this Agreement, subject to section 42). The Purchaser may waive or relax compliance with any of the conditions to the obligations of the Purchaser under this Agreement without prejudice to its right of rescission in the event of non-fulfillment of the same condition at a later time or in the event of non-fulfillment of any other condition or conditions, provided that any such waiver or relaxation shall be binding upon the Purchaser only if made in writing.

42)    In the event this Agreement is rescinded by the Purchaser under section 41), or terminated by the Vendor under section 4)c), then the following shall apply:

a)    the Purchaser shall immediately instruct the IP Counsel that it has no rights to the Intellectual Property or Trade Secrets and must immediately return any and all Intellectual Property and Trade Secret materials to the Vendor and instruct the IP Counsel to do the same; and

b)    the provisions of sections 51) through 53) shall survive termination of this Agreement, and the reference in such section to "Matriculation" shall be deemed to be amended to the date of termination of this Agreement; and

c)    the provision of sections 46) through 49) shall survive termination of this Agreement and shall be deemed to apply to DHS in respect of the Eau Claire Partnership, and the reference in such sections to "Matriculation" shall be deemed to be amended to the date of termination of this Agreement.

## CONDITIONS TO THE OBLIGATIONS OF THE VENDOR

43)    The obligations of the Vendor to complete the transactions contemplated by this Agreement and the obligations of the Vendor under this Agreement shall be subject to the fulfillment on or before Closing Date of the following conditions:

a)    that the Closing Date be before or on July 1, 2011, subject to ability to mutually agree to extend the Closing Date for up to a further sixty (60) days;

b)    each of the representations and warranties of the Purchaser contained in section 13) shall be true and correct as at the Closing Date;

c)    the Vendor have, to his satisfaction, inspected the financial statements and records of the Purchaser;

d)    At the Closing Date the Purchaser shall have obtained all necessary regulatory approvals from the Exchange or any other regulatory body having authority for the acquisition of the Purchased Interests, the issuance of the Payment Shares and the other transactions contemplated hereunder;

e)      At the Closing Date the Purchaser shall have obtain all necessary approvals from the Purchaser's shareholders for the acquisition of the Purchased Interests, issuance of the Payment Shares and the other transactions contemplated hereunder;

f)      all documents, instruments and assurances required to be delivered to the Vendor by the Purchaser pursuant to section 38) shall have been delivered on or prior to Closing Date;

44)   The conditions set out in section 43) have been inserted for the benefit of the Vendor.  If any of the conditions set out in section 43) shall not have been fulfilled on or prior to Closing Date, the Vendor may rescind this Agreement by notice to the Purchaser and in such event the Vendor shall be released from all of its obligations under this Agreement, subject to section 45). The Vendor may waive or relax compliance with any of the conditions to the obligations of the Vendor under this Agreement without prejudice to its right of rescission in the event of non-fulfillment of the same condition at a later time or in the event of non-fulfillment of any other condition or conditions, provided that any such waiver or relaxation shall be binding upon the Vendor only if made in writing.

45)   In the event this Agreement is rescinded by the Vendor under section 44), or terminated by the Vendor under section 4)c), then the following shall apply:

a)   the Purchaser shall immediately instruct the IP Counsel that it has no rights to the Intellectual Property or Trade Secrets and must immediately return any and all Intellectual Property and Trade Secret materials to the Vendor and instruct the IP Counsel to do the same; and

b)   the provisions of sections 51) through 53) shall survive termination of this Agreement, and the reference in such section to "Matriculation" shall be deemed to be amended to the date of termination of this Agreement; and

c)   the provision of sections 46) through 49) shall survive termination of this Agreement and shall be deemed to apply to DHS in respect of the Eau Claire Partnership, and the reference in such sections to "Matriculation" shall be deemed to be amended to the date of termination of this Agreement.

## CONFIDENTIALITY, NON-COMPETITION AND NON-SOLICITATION

46)   The Vendor acknowledges that he has had access to: (i) certain information, technology and other proprietary and customer documentation at DHS; (ii) any information related to the Intellectual Property or the Assets; and (iii) certain information, technology and other proprietary and customer documentation of the Purchaser obtained through conducting due diligence hereunder or conducting prior business with the Purchaser (the "Confidential Information"). Such Confidential Information is valuable, confidential and proprietary information and includes, without limitation, the following:

a)      all technical, scientific, economic and business information including, without limitation, all Intellectual Property, computer programs, maps, specifications, pricing strategies, sales analysis reports, designs, processes, procedures, customer information, reports or parts or portions thereof which are conceived, originated or prepared by DHS, the Purchaser or any person or firm associated or affiliated

with it and their respective employees, officers, agents or representatives;

b)      any proprietary or Confidential Information disclosed to DHS or the Purchaser by others to which the Vendor had access during either the course of their ownership of DHS, ownership of the Assets or conducting due diligence on the Purchaser or conducting business with the Purchaser;

c)      all financial records of DHS or the Purchaser or any of its associated or affiliated companies;

d)      marketing contacts, mailing lists, client and supplier information and other data used internally by DHS or the Purchaser to identify clients and potential clients for business purposes;

e)      any hardware or computer software specifications developed by DHS's or the Purchaser's employees and contractors;

f)      any system, utility, code or application computer programming existing on paper, magnetic tape, disk, CD, DVD or any other electronic or digital storage material or device owned by DHS or the Purchaser; and

g)      all technology, works, designs, audio, visual, literary, dramatic or other works and integrated circuit topographies owned by DHS or the Purchaser.

47)   The Vendor agree not to disclose, directly or indirectly, to any other person, firm, corporation or entity nor use at any time any Confidential Information disclosed to or acquired by the Vendor. The Vendor shall have no obligation with respect to such Confidential Information which:

a)      is already publicly known;
b)      is or becomes publicly known through no wrongful act of the Vendor; or
c)      is approved for release by management of the Purchaser.

48)   The Vendor shall be prohibited on world-wide basis from, either directly or indirectly, whether alone or in conjunction with any other individual, firm, corporation, partnership, joint venture or other entity whether as a principal, agent, partner, employee, contractor or shareholder or any other manner whatsoever, carry on, advertise or be engaged in or be connected with or interested in or advise, lend money to, guarantee the debts or obligations of or permit his or her name to be used or employed by any person, firm, corporation or entity who carries on a business which is the same or substantially similar to or which directly competes with either: (i) the business actually conducted by the Purchaser or any part thereof or contemplated to be conducted by Purchaser; or (ii) the Water and Energy Assets and the Intellectual Property related thereto or any part thereof, for a period of five (5) years following the completion of the Matriculation.

49)   The Vendor further agrees that he shall not solicit the business, employment or engagement of any of the Purchaser's customers and clients, nor solicit or induce any employee or independent sales representative of the Purchaser to sever or abandon such employment or representation with the Purchaser, without prior written consent of the Purchaser for a period of five years (5) years following completion of the Matriculation.

50)   The Vendor and DHS acknowledge that they have had the opportunity to obtain independent legal advice on the restrictive covenants contained in sections 46) through 49) and notwithstanding the broad scope of such restrictive covenants they acknowledge and agree that such restrictive covenants are reasonable, necessary and acceptable in the context of the nature of the transactions contemplated hereunder and the nature of the Assets and Intellectual Property held by DHS.

51)   The Purchaser acknowledges that it has had access to: (i) certain information, technology and other proprietary and customer documentation at DHS; (ii) any information related to the Intellectual Property or the Assets; and (iii) certain information, technology and other proprietary and customer documentation of the DHS or the Vendor obtained through conducting due diligence hereunder or conducting prior business with the Purchaser (the "Confidential Information"). Such Confidential Information is valuable, confidential and proprietary information and includes, without limitation, the following:

   a)   all technical, scientific, economic and business information including, without limitation, all Intellectual Property, computer programs, maps, specifications, pricing strategies, sales analysis reports, designs, processes, procedures, customer information, reports or parts or portions thereof which are conceived, originated or prepared by DHS, the Vendor or any person or firm associated or affiliated with it and their respective employees, officers, agents or representatives;

   b)   any proprietary or Confidential Information disclosed to the Purchaser by others to which the Purchaser had access during either the course of conducting due diligence on DHS and the Vendor or conducting business with the Vendor;

   c)   all financial records of DHS or the Vendor or any of its associated or affiliated companies;

   d)   marketing contacts, mailing lists, client and supplier information and other data used internally by DHS or the Vendor to identify clients and potential clients for business purposes;

   e)   any hardware or computer software specifications developed by the Vendor or the Vendor's employees and contractors;

   f)   any system, utility, code or application computer programming existing on paper, magnetic tape, disk, CD, DVD or any other electronic or digital storage material or device owned by DHS or the Vendor; and

   g)   all technology, works, designs, audio, visual, literary, dramatic or other works and integrated circuit topographies owned by DHS or the Vendor.

52)   The Purchaser agrees not to disclose, directly or indirectly, to any other person, firm, corporation or entity nor use at any time any Confidential Information disclosed to or acquired by the Purchaser. The Purchaser shall have no obligation with respect to such Confidential Information which:

   a)   is already publicly known;
   b)   is or becomes publicly known through no wrongful act of the Vendor; or
   c)   is approved for release by management of the Purchaser

53) The Purchaser agrees that it shall not solicit the business, employment or engagement of any of the Vendor's customers and clients, nor solicit or induce any employee or independent sales representative of the Vendor to sever or abandon such employment or representation with the Vendor, without prior written consent of the Vendor for a period of five years (5) years following completion of the Matriculation.

54) The Purchaser acknowledges that it has had the opportunity to obtain independent legal advice on the restrictive covenants contained in sections 51) through 53) and notwithstanding the broad scope of such restrictive covenants the Vendor acknowledges and agrees that such restrictive covenants are reasonable, necessary and acceptable in the context of the nature of the transactions contemplated hereunder and the nature of the Assets and Intellectual Property held by DHS.

## FAIR MARKET VALUE

55) The Vendor and the Purchaser agree that the Purchase Price is intended to be the fair market value of the Purchased Interests, as of the Closing Date, and declare that it is the bona fide belief and agreement of the parties as to such fair market value. In the event that any taxing authority having jurisdiction alleges that the Purchase Price is not the fair market value of the Purchased Interests at the Closing Date, proposes to make an assessment of tax on the basis that any benefit or advantage is or has been conferred on any person by reason of the purchase and sale provided for in this Agreement, then the purchase price of the Purchased Interests shall be deemed to be and always to have been either:

   a) such amount as may be agreed on by the Vendor, the Purchaser, and such taxing authority as being the fair market value of the Purchased Interests as of the Closing Date; or

   b) in the absence of such agreement, the amount finally determined by such tribunal or court as has jurisdiction in the matter to be equal to the fair market value of the Purchased Interests as of the Closing Date.

## CLOSING AND POST CLOSING MATTERS

56) Subject to sections 40) and 43), the transactions contemplated by this Agreement shall close on Closing Date at the hour of 10:00 a.m. (Calgary time) at the offices of McLeod & Company LLP, Barristers and Solicitors, 3rd Floor, 14505 Bannister Road SE., Calgary, Alberta, or at such other place or time as shall be mutually agreed to by the Purchaser and the Vendor.

57) After the Closing Date, each party shall provide to the other party such cooperation and information as either of them may reasonably request for the purpose of:

   a) filing any tax returns, amended tax returns or claim for refund of or by DHS;

   b) determining a liability for Taxes or a right to refund of Taxes of or by DHS; and
   c) conducting any audit or other proceeding in respect of Taxes paid or payable by DHS.

Such cooperation and information shall include providing copies of all relevant portions of tax returns of DHS, together with relevant accompanying schedules and work papers, relevant documents relating to rulings or other determinations by taxing authorities and relevant records concerning the ownership and tax basis of property which such party may possess in connection with DHS.

## GENERAL

58)  This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and cancels and supersedes any prior understandings and agreements between the parties with respect thereto.  There are no representations, warranties, terms, conditions, undertakings or collateral agreements, express, implied or statutory, between the parties other than as expressly set out in this Agreement.

59)  Any notice to be given in connection with this Agreement shall be given in writing and shall be given by personal delivery, by registered mail, by transmittal by telecopier or by electronic mail addressed to the recipient as follows:

   a)      To the Purchaser at:
           Suite 200, 3016 - 19th Avenue S.W.
           Calgary, Alberta T2E 6Y9.
           Fax: (403)
           Email: tker@ridgelinecanada.com
           Attention:  Tony Ker

   b)      To the Vendor at:
           Dennis M. Danzik
           15111 North Hayden Road
           Scottsdale, AZ 85260
           Fax:
           Email: danzik@danzik.pro

or to such other address, telecopier number, e-mail address or individual as may be designated by notice given by either party to the other.  Any communication given by telecopier or email shall be conclusively deemed to have been given on the day of successful transmittal.  If the party giving any notice knows or ought reasonably to know of any difficulties with any method of delivery, notice shall be given by another method.

60)  If any provision of this Agreement is determined to be invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part of a provision and the remaining part of such provision and all other provisions shall continue in full force and effect.

61)  This Agreement may be executed in several counterparts and by facsimile or scan, each of which so executed shall be deemed to be an original, and such counterparts together shall constitute but one and the same instrument.

62)  Neither party may assign any rights or obligations under or in respect of this Agreement.

63)  Time shall be of the essence of this Agreement.

64)     Each of the parties hereto shall bear all expenses incurred by it in connection with this Agreement including, without limitation, the charges of their respective counsel, accountants and financial advisors.

65)     No waiver by either party shall be effective unless in writing, and a waiver shall affect only the matter specifically identified in the writing granting such waiver and shall not extend to any other matter.

66)     Each party shall, from time to time and without additional consideration, perform all acts and execute and deliver all documents required to carry out and give full effect to the terms of this Agreement.

67)     The provisions of this Agreement shall survive the completion of the sale of the Purchased Interests and shall not merge in any transfer or other document or instrument executed or delivered pursuant to this Agreement.  Without limiting the generality of the foregoing, the liability of a party for any breach of any of its representations, warranties, covenants, agreements or other obligations hereunder prior to the completion of the sale of the Purchased Interests shall not be extinguished or in any manner diminished by such completion.

68)     This Agreement shall be construed and enforced in accordance with the laws of the Province of Alberta and the parties hereto agree to submit to the jurisdiction of the courts of said province for the purpose of such construction and enforcement.

69)     Each party acknowledges that it has had the opportunity to obtain, or has obtained, independent legal, accounting and tax advice with respect to resale restrictions of the Payment Shares and the effects of the transactions contemplated herein. Each party is fully responsible for any Taxes arising from the transaction. Neither party has relied upon the comments or advice or the other or their respective advisors. The parties further agree that the doctrine of *contra proferentem* shall not apply to any interpretation of this Agreement.

*The balance of the page is intentionally left blank*

70)     This Agreement shall be binding upon and shall enure to the benefit of the parties hereof, their respective representatives, heirs, executors, administrators, successors and assigns. Nothing herein, expressed or implied, is intended to confer upon any person, other than the parties hereto and their respective heirs, successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals, all on the day and year first above written.


**RIDGELINE ENERGY SERVICES INC.**


Per: _____
      **TONY KER**

**DANZIK HYDROLOGIC SCIENCES, LLC**


Per: _____


_____          _____
**DENNIS M. DANZIK**                        Witness

SCHEDULE "A"

**MEMBERS OF DHS.**

| Name | Purchased Interests  Held |
|------|---------------------------|
| Dennis M. Danzik | 100% |
| Total | 100% |

**SCHEDULE "B"**

**WATER ASSETS**

1.      All Intellectual Property and Equipment that is owned by DHS. or otherwise related to or connected with the following technologies:

    A.      A method to control electrolysis and shock diffusion for the reactive production $H_2$ and O in water and other fluids containing water for collection of valuable contaminants, and remediation of the water or fluid itself to a desired state.

    B.      An extremely low energy hydrodynamic electrolytic reactor designed to control catalysis through the use of flow rate and energy consumption.

    C.      A hydrodynamic gravitational system for the treatment, recycling and production of a water product from waste water sources incorporating electrolytic catalysis to produce ultra violet radiation and enhance the multi point production of $O_3$ and $H_2$ in water.

    D.      A power supply technology for the purpose of the providing the type of electrical conditioned power needed to operate the water treatment process. This may include power from generators and or direct grid power supply.


Which includes without limitation: (i) The worldwide rights to all water based Intellectual Property and improvements thereon; (ii) water treatment processes applied to the oil and gas industry and more specifically, frac and produce water processing, Oil sands water processing SAGD, tailings or any part of the water used in these processes, leachate water processing; and (iii) standing water processing.

2.      A 50% partnership the Eau Partnership held by DHS.

**SCHEDULE "C"**

**ENERGY ASSETS**

1.      All Intellectual Property and Equipment that is owned by DHS. or otherwise related to or connected with the following technology:

     A.      The fuel technology that uses a stepped pressure process and used the inherent qualities of both vegetable oil and petroleum based oils from pure or waste sources as petroleum fuel dilatant and therefore extends the more expensive fuel with a less expensive combustible fuel additive for biofuels.

     B.      The conversion and setup of electrical generation equipment that works in conjunction with the WATER ASSETS and that provides for the successful distribution of power, conditioned for use, while providing a platform for the consumption of diesel fuel, natural gas and specified liquid fuel derived from plant source.

Which includes without limitation: The worldwide rights to liquid fuel production for diesel engines, utilizing a fuel produced from electro catalytic techniques to produce a heavy liquid fuel from combustible liquids gleaned from waste water and other sources, including all improvements thereon.

## SCHEDULE "E"

## EMPLOYEE DISCLOSURE

Nil

## SCHEDULE "F"

### EMPLOYEE BENEFIT PLANS

Nil

## SCHEDULE "G"

## EQUIPMENT LEASES

Nil

## SCHEDULE "H"

## LICENCES

Nil

**SCHEDULE "I"**

## PATENTS

## SCHEDULE "J"

## U.S. ACCREDITED INVESTOR CERTIFICATE

The undersigned hereby tenders this U.S. Accredited Investor Certificate to Ridgeline Energy Services Inc. (the "**Company**") in connection with the Purchase Agreement, pursuant to which the undersigned will be receive common shares in the capital stock of the Company (the "**Shares**"). By execution of this certification, the undersigned acknowledges that the Company is relying upon the accuracy and completeness of the representations contained herein in complying with its obligations under applicable securities laws.

1.     Undersigned's Representations. The undersigned acknowledges and represents that:

(a)     The undersigned acknowledges that the Shares have not been and will not be registered under the Securities Act of 1933, as amended (the "**Securities Act**"), or under the securities laws of any state and, therefore, none of such Shares can be sold unless they are subsequently registered under said laws or exemptions from such registrations are available; (iii) the undersigned may not be able to liquidate the undersigned's investment in the event of an emergency or pledge any of such securities as collateral for loans; and (iv) the transferability of the Shares is restricted and (A) requires the written consent of the Company and (B) legends will be placed on the certificate(s) representing the Shares referring to the applicable restrictions on transferability;

(b)     The undersigned is a bona fide resident of, is domiciled in and received the offer and made the decision to invest in the Shares in the state set forth on the signature page below, and the Shares are being purchased by the undersigned in the undersigned's name solely for the undersigned's own beneficial interest and not as nominee for, or on behalf of, or for the beneficial interest of, or with the intention to transfer to, any other person, trust or organization;

(c)     The undersigned acknowledges and aggress that upon transfer to the undersigned, if such transfer occurs within the distribution compliance period as contemplated in the Agreement (one year from distribution to Vendor from Purchaser), that the Shares will bear the following legend:

"THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"). THESE SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, DIRECTLY OR INDIRECTLY, ONLY (A) TO THE COMPANY, (B) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, (C) IN COMPLIANCE WITH THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER, IF AVAILABLE, AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, OR (D) IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE SECURITIES ACT OR ANY APPLICABLE STATE SECURITIES LAWS, AND THE HOLDER HAS,

PRIOR TO SUCH SALE, FURNISHED TO THE COMPANY AN OPINION OF COUNSEL OR OTHER EVIDENCE OF EXEMPTION, IN EITHER CASE REASONABLY SATISFACTORY TO THE COMPANY.  DELIVERY OF THIS CERTIFICATE MAY NOT CONSTITUTE "GOOD DELIVERY" IN SETTLEMENT OF TRANSACTIONS ON STOCK EXCHANGES IN CANADA."

provided, that if Shares are being sold under clause (B) above, at a time when the Company is a "foreign issuer" as defined in Rule 902(e) of Regulation S under the Securities Act, the legend set forth above may be removed by providing a declaration and other documentation, evidencing the availability of the exemption, in the form as the Purchaser may from time to time prescribe to the Purchaser's transfer agent, to the effect that the sale of the securities is being made in compliance with Rule 904 of Regulation S under the Securities Act; and

(d)     The undersigned certifies, under penalties of perjury, that the undersigned is **not** subject to the backup withholding provisions of Section 3406(a)(i)(C) of the Internal Revenue Code of 1986, as amended (Note:  you are subject to backup withholding if (i) you fail to furnish your Social Security number or taxpayer identification number herein; (ii) the Internal Revenue Service notifies the Company that you furnished an incorrect Social Security number or taxpayer identification number; (iii) you are notified that you are subject to backup withholding; or (iv) you fail to certify that you are not subject to backup withholding or you fail to certify your Social Security number or taxpayer identification number.).

2.     <u>Accredited Investor Status</u>.  The undersigned represents and warrants, by initialing the appropriate statement, that the undersigned is an "accredited investor" as defined in Rule 501(a) of Regulation D of the Securities Act, because the undersigned meets at least one of the following criteria (please **initial** each applicable item):



\_\_X\_\_\_     The undersigned is a natural person whose individual net worth, or joint net worth with his or her spouse, exceeds $1,000,000 at the time of the undersigned's purchase (**Note**: The value of an individual's primary residence may not be included in this net worth calculation, and any indebtedness in excess of the value of an individual's primary residence should be considered a liability and should be deducted from an individual's net worth.); or

\_\_X\_\_\_     The undersigned is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with the undersigned's spouse in excess of $300,000 in each of those years and who reasonably expects to reach the same income level in the current year; or

\_\_X\_\_\_     The undersigned is a director, executive officer or general partner of the Company, or a director, executive officer or general partner of a general partner of the Company.

This Certification of Investment Intent is signed this _____ day of _____,2011.

| If signed by individual: | |
|---|---|
| <br><br>_____<br>Signature<br><br>Dennis M Danzik<br>(Print Name)<br><br> | 7355 N 70th Street<br>Paradise Valley, Arizona  85253 |

## SCHEDULE "K"

## ASSIGNMENT

## ASSIGNMENT OF INTERESTS
## IN DANZIK HYROLOGIC SCIENCES, LLC

This Assignment of Interests (this "**Assignment**") is made and entered into effective as of this ● day of ●, 2011, by and between **DENNIS M. DANZIK** ("**Assignor**") and **RIDGELINE ENERGY SERVICES INC.,** a corporation duly incorporated under the laws of the Province of Alberta ("**Assignee**").  This Assignment is being executed and delivered under the terms of that certain Purchase Agreement dated April ●, 2011 (the "**Purchase Agreement**"), by and among Assignor, Assignee and **DANZIK HYDROLOGIC SCIENCES, LLC**, a Delaware limited liability company (the "**Company**").  Terms not otherwise defined herein have the meanings set forth in the Purchase Agreement.  Assignor, Assignee and the Company are referred to herein as the "**Parties**".

## RECITALS:

A.      Assignor is the sole member of the Company and owns all of the issued and outstanding Equity Interests in the Company.

B.      The Parties have agreement pursuant the terms of the Purchase Agreement, Assignor will assign, transfer and convey all his rights, title and interests in the Equity Interests to Assignee (the "**Assignment**").

C.      Assignor understands that, as a result of the Assignment, Assignee will become the sole member of the Company.

## ASSIGNMENT:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which the Parties hereby acknowledge, the Parties do hereby agree as follows:

1.      Assignment of LLC Interests.  Effective as of the date of this Assignment, Assignor hereby assigns, transfers and conveys to Assignee, and Assignee hereby accepts and acquires from Assignor, the Equity Interests in consideration for the payments and obligations set forth in the Purchase Agreement.

2.      Sole Member of the Company.  Following the Assignment, Assignee shall own all of the LLC Interests and shall be substituted in Assignor's place as the sole member of the Company.

3.      Effect of Assignment.  Assignor acknowledges and understands that following the Assignment, Assignee, as the sole member of the Company, shall possess all right, title, and interest in and to the properties and other assets of the Company.  The Parties agree that the LLC Agreement will be amended to give effect to the Assignee as the sole member, manager and holder of Equity Interests in the Company.

4.      Cooperation.  The Parties agree to cooperate with each other in the furnishing of information, the execution of deeds or other documents, and the taking of any other action reasonably necessary to fully effectuate this Assignment and the Assignment.

5.      Governing Law.  This Assignment and all acts and transactions pursuant hereto and the rights and obligations of the Parties hereto shall be governed by, and construed in accordance with, the laws of the Province of Alberta..

6.      Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Assignment effective as of the date first given above.

**ASSIGNOR:**

**DENNIS M. DANZIK**

By: _____

Name: _____

**ASSIGNEE:**

**RIDGELINE ENERGY SERVICES INC.**

By:

Name:  Tony Ker

Title:  Chief Executive Officer

**COMPANY:**

**DANZIK HYDROLOGIC SCIENCES, LLC**

By: _____

Name: _____

Title: _____