# EXHIBIT M

## DEVELOPMENT AND SUPPLY AGREEMENT

This Development and Supply Agreement ("Agreement") is entered into as of April 18, 2011 (the "Effective Date"), by and between Danzik Applied Sciences, LLC, a Delaware limited liability company with its principal address at 15111 North Hayden Road, Scottsdale, AZ 85260 ("DAS"), and Ridgeline Energy Services, Inc., a Canadian public company with its principal office at 3016 19 Street N.E. Suite 200 Calgary, Alberta T2E 6Y9 ("RLE").

## RECITALS

A.     RLE has entered into a Share Purchase Agreement dated April 4, 2011 (the "Purchase Agreement") with Dennis M. Danzik, the sole member of DAS ("Danzik"), under which RLE will acquire certain all the issued and outstanding interest of Danzik Hydrologic Sciences, LLC. ("DHS"). It is condition of the Purchase Agreement that RLE and DAS shall enter into this Agreement.

B.     Through the acquisition of DHS, RLE will acquire and own all the right, title and interest to certain assets and intellectual property more particularly described in Exhibit "A", with respect to the use, manufacture, and sale of technology, processes, know-how, patentable inventions, and confidential information for the processing of waste water, and the production of electrical generating equipment. (the "Intellectual Property").

C.     DAS is a manager, designer, manufacturer and supplier of certain turnkey equipment related to the Intellectual Property. RLE wishes to engage DAS to provide for the exclusive and priority manufacturing of certain systems and equipment described on Exhibit "B" using the Intellectual Property under license from RLE in accordance with the terms and conditions set for in this Agreement (the "Equipment").

D.     Danzik is the inventor of the processes comprising the Intellectual Property, the Vendor under the Purchase Agreement and the principal of DAS, and as such RLE wishes to contract with DAS to provide exclusive research and development services for the purposes of developing, advancing and improving the Intellectual Property (the "R&D").

E.     RLE and DAS agree that all transactions regarding the Equipment and the R&D shall be in accordance with this Agreement, including the Exhibits hereto and the Share Purchase Agreement as applicable.  All Exhibits referenced herein and attached hereto are hereby incorporated by reference into this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and of the mutual promises contained herein, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1.     **SCOPE AND EXCLUSIVITY**

1.1     <u>Scope</u>. Subject to Section 9, this Agreement shall cover all aspects of:

1.1.1     the manufacturing supply, training of RLE staff and installation of the Equipment using the Intellectual Property under license including, without limitation, the development, design, manufacture and shipment

1

**Section 4 - 4.9 a iii) Transactions involving Securities**

NP-DAS 00020

of the Equipment, and all necessary training of RLE staff, testing, commissioning of the Equipment; and

1.1.2  the contracting of the R&D including the funding, design, testing, engineering, development, improvement and innovation of the Intellectual Property for and on behalf of RLE.

1.2  <u>Manufacturing License</u>.  RLE hereby grants DAS a non-exclusive licence to use the Intellectual Property for the sole and limited purposes of manufacturing the Equipment exclusively for RLE in accordance with this Agreement (the "IP License").  RLE may at its sole discretion terminate the IP License at any time upon written notice to DAS and IP License shall automatically terminate upon the termination of this Agreement in accordance with Section 9.

1.3  <u>RLE Exclusivity</u>.  DAS agrees and acknowledges that certain feature of the Equipment and the Intellectual Property are confidential, unique and proprietary to RLE and DAS undertakes to manufacture and supply the Equipment exclusively for and to RLE and any third party for which DAS has expressly authorized DAS in writing to manufacture or supply the Equipment. DAS agrees not to manufacture the Equipment or any products substantially similar to the Equipment in form, content or use to any other person or entity other than RLE nor shall they provide knowledge, consulting services, engineering or knowhow, or disclose any of the Intellectual Property, to any other party.

1.4  <u>RLE Priority</u>. It is acknowledged by RLE that DAS will be involved with research and development and manufacturing projects outside of this Agreement. It is agreed by DAS that DAS will always place the R&D and the Equipment manufacturing and delivery requirements as a priority over orders or opportunities presented by other customers or potential customers of DAS.

1.5  <u>DAS Exclusivity</u>. RLE acknowledges that DAS has specialized knowledge and the ability to assist RLE in maintaining confidentiality and secrecy in regards to the Intellectual Property. RLE agrees that during the term of this Agreement, DAS shall be the only contractor RLE uses to manufacture the Equipment related to the Intellectual Property and the exclusive contractor for the R&D conducted on the Intellectual Property.

## 2.  MANUFACTURING PRICE AND PAYMENT

2.1  <u>Price</u>.  The manufacturing price for Equipment shall be in U.S. dollars and the price for each piece of Equipment shall be equal to DAS's actual net cost plus 15% on any Equipment that is not purchased directly by RLE. RLE will have the right to purchase directly all equipment or supplies, except for any Equipment or supplies that remain subject to the Matriculation (as defined in Exhibit C). Where the Matriculation has not occurred DAS will be entitled to charge DAS's actual net cost plus 15%. Upon Matriculation DAS shall provide RLE will the option to buy directly from the supplier without any additional charge and at the same purchase pricing available to DAS.  From time to time during the Term DAS shall provide RLE with all reasonable documentation necessary to substantiate its cost for the Equipment.

2.2  <u>Orders and Delivery</u>.  RLE shall submit purchase orders ("Orders") to DAS for Equipment specifying the quantity of and type of Equipment to be delivered to RLE and the requested delivery schedule.  RLE shall also submit on a monthly basis a non-binding rolling twelve (12) month forecast of its anticipated Orders to facilitate DAS's ability to plan for the manufacture of Equipment and to optimize its purchasing costs. Orders for Equipment in

<div align="center">2<br>
<b>Section 4 - 4.9 a iii) Transactions involving Securities</b></div>

NP-DAS 00021

inventory will be shipped within ten (10) business days after receipt of Order. Orders for parts in inventory shall be shipped with one day after receipt of Order. If DAS determines that it cannot deliver the Equipment on or before the request date, DAS shall notify RLE of such inability as promptly as practical after receipt of the Order and identify the date on or before which DAS shall deliver the Equipment (the "Due Date") in accordance with Section 4.1 and 4.2. If RLE does not approve of the Due Date, RLE may rescind such Order within five (5) business days after receipt of notice of the Due Date. If RLE does not rescind such Order within the five (5) business day period, RLE shall be deemed to have accepted the Due Date. Each Order shall be deemed to incorporate all of the terms and conditions of this Agreement by reference, which terms and conditions may not be modified by any Order unless the Order expressly refers to this Section of this Agreement, is signed by the parties and is appended to this Agreement as an amendment.

      2.3    <u>Cancellation</u>. Any Order may be cancelled at any time by RLE by written notice, RLE shall pay DAS for costs incurred by DAS to the date of the notice plus ten percent (10%), providing all such work is delivered to RLE. However, on materials returned to DAS, only a specific restocking charge shall apply. RLE's liability is strictly limited as described herein and no further loss or liability will accrue. Payment of outstanding amounts to DAS by the RLE is due within thirty (30) days of receipt of RLE's written cancellation notice.

      2.4    <u>Rush Shipments</u>. From time to time, RLE may need Equipment rush basis that is severely time constrained. In such instances, DAS may at its sole option, commit to delivering such rush Orders. If DAS accepts such a rush Order, and is successful in delivering such rush Order for Equipment, DAS shall be entitled to any additional fees agreed to by RLE and DAS at the time the rush Order is placed by RLE and accepted by DAS.

      2.5    <u>Invoices</u>. DAS will submit invoices to RLE including: purchase order numbers, description of Equipment, quantities, unit price, complete bill to address, complete description including dates of services provided, and fee totals.

      2.6    <u>Taxes</u>. The Manufacturing Price is exclusive of any tariffs, duties, sales, service, use, excise, value-added, or other similar levies or taxes applicable to the price, sale, or delivery of any Equipment or their use by RLE (collectively, "Taxes"), and RLE shall pay all such Taxes and indemnify and hold harmless DAS for the same. All Taxes shall be included in the applicable invoice unless RLE provides DAS with such documentation, including exemption certificates, required by DAS to allow DAS to refrain from collecting Taxes it would otherwise be obligated to collect.

      2.7    <u>Payment</u>. RLE will pay all undisputed invoice amounts within 30 days after the receipt date, provided that all invoiced Equipment shall have been received and accepted by RLE as provided in this Agreement. On Orders in excess of $100,000.00, RLE shall prepay DAS or pay DAS on a budget schedule that has been mutually agreed upon prior to the start of any Order.

**3.    EQUIPMENT AND MANUFACTURING TERMS**

      3.1    <u>Technical Specifications</u> When authorized by an Order of RLE, DAS shall, as an independent contractor, manufacture the Equipment based on the specifications described in Exhibit "B" (the "Technical Specifications"). DAS will furnish all materials therefore, all in accordance with the terms and conditions of this Agreement. The Equipment specifications and all information provided and to be provided under this Agreement by RLE are considered to be Confidential Information under Sections 8.1 and 8.2.

<div align="center">3</div>

<div align="center">**Section 4 - 4.9 a iii) Transactions involving Securities**</div>

3.2     Technical Compliance. DAS agrees to manufacture the Equipment in a good and workmanlike manner in accordance with the Technical Specifications. The Equipment manufactured shall conform in all respects to the description, plans, specifications, drawings and designs set out in the under the Technical Specifications. If all or any part of the Equipment are found not to comply with the Technical Specifications, RLE shall have the right to require revisions and repairs by DAS at the DAS's expense.

3.3     DAS Warranties. DAS represents and warrants to RLE that:

    3.3.1     DAS is a limited liability corporation validly incorporated and is in good standing under the laws of the State of Delaware;

    3.3.2     DAS has full power and authority to execute, deliver and perform its obligations under this Agreement, and this Agreement constitutes a valid and legally binding obligation of the DAS, enforceable in accordance with its terms, subject to the rights of the DAS's creditors at law and equity;

    3.3.3     the execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement and the fulfillment of and compliance with the terms and provisions of this Agreement do not and will not:

        (a)     conflict with, result in a breach of, constitute a default under or accelerate or permit the acceleration of the performance required by any agreement, instrument, lease, license, permit or authority to which the DAS is party or is subject or by which the DAS is bound,

        (b)     violate any provision of any law, statute or regulation or any judicial, administrative or governmental order, award, judgment, ruling or decree binding on or applicable to the DAS;

    3.3.4     has good and marketable title to the Equipment being manufactured on behalf of RLE;

    3.3.5     the Equipment manufactured will conform to the Technical Specifications as agreed to by the parties from time to time and that the Equipment is free from defects in materials, design and workmanship at the time of delivery to RLE.

    3.3.6     DAS shall transfer and deliver title to the Equipment, free and clear of any liens or encumbrances

    3.3.7     DAS possesses the necessary skills and expertise to carry out the services to be provided hereunder;

    3.3.8     DAS is in compliance with and shall at all times during the term maintain, all necessary licenses, intellectual property rights, permits and approvals required to execute, deliver and perform its obligations under this Agreement.

<div align="center">4

**Section 4 - 4.9 a iii) Transactions involving Securities**</div>

3.4    Equipment Changes.   The parties shall notify each other in advance and in writing prior to implementation of any proposed change in the following aspects of the Equipment, the Technical Specifications or their components: item form, fit or function; source of materials; manufacturing processes; site of manufacture; composition; contract processing or testing; test methods; labeling; and design changes.   No such change may be implemented without RLE's prior consent.

3.5    Facilities. Various facilities will be needed to complete the work by DAS under the terms and conditions of this Agreement. RLE will no later than June, 2011 lease or purchase a suitable facility in Phoenix, Arizona in order to manufacture the Equipment, subject to Section 8.4. DAS has at its sole option of subleasing laboratory and office space at the same facility, under the same terms and conditions as RLE may arrange with a future real estate purchase or lease.

3.6    Inspection and Audits.   Subject to the provisions of the Matriculation, RLE may inspect the Equipment and monitor DAS's performance during the manufacturing process at any reasonable time. RLE may conduct audits of DAS's quality systems at RLE's sole cost and expense. Subject to the provision of Section 8.13, DAS will not refuse RLE's reasonable requests for access to DAS's facilities for the purpose of conducting such audits at any DAS location, provided that all such access shall be coordinated in a fashion so as not to disrupt DAS's business. DAS may take steps to keep DAS trade secrets confidential, and those specific areas of DAS business shall not be accessible to RLE.

3.7    Records. DAS shall maintain complete and accurate accounting records, in a form in accordance with generally accepted accounting principles to substantiate DAS's invoices. DAS shall retain such records for two (2) years from the date of payment of the Manufacture Price. RLE shall have access (upon reasonable notification) to such records for purposes of audit, during normal business hours, during the Term of this Agreement and during the period for which DAS is required to retain such records

3.8    Reporting.   DAS and RLE may mutually agree from time to time on reports to be provided by DAS to RLE hereunder.

3.9    Branding. In addition to any logo, trademark or branding that RLE desires on the Equipment, DAS and Danzik will have the right to brand the Equipment with the DAS or Danzik logo, trademark for advertising and other information, necessary for the safe operation of the Equipment. The design and placement of such logo or trademark on the Equipment shall be subject to RLE's approval, which shall not be unreasonably withheld, and shall be subject to the following conditions:

   3.9.1    All DAS and Danzik branding shall appear smaller than any RLE logo, trademark or branding on the Equipment and in no circumstance shall the DAS or Danzik logo be larger than fifteen (15%) percent of any continuous surface, on any geometric plane of the Equipment.

   3.9.2    Such branding by DAS and Danzik shall relate strictly to manufacturing equipment and vehicles only.

   3.9.3    RLE agrees to maintain the integrity of such DAS or Danzik logos with the same vigilance and maintenance as their own branding and logotypes affixed to surfaces, and prevent or repair DAS or Danzik logos that are

5

**Section 4 – 4.9 a iii) Transactions involving Securities**

damaged or vandalized. DAS and or Danzik shall be responsible for the
initial cost of any DAS or Danzik branding.

3.9.4   Subject to the confidentiality provision of sections 8.1 through 8.3, DAS
or Danzik will have the right to present or discuss the inventions related
to the Intellectual Property.

3.10    Sub-Contracting. DAS shall not be entitled to sub-contract the manufacturing of
Equipment or components relating to the Intellectual Property or the Equipment, unless such
components are not related to, or require knowledge of, any Confidential Information described
in Sections 8.1 and 8.2, or such other items as may be agreed to by the Purchaser. All agreements
in connection with the work entered into by DAS with subcontractors shall include the terms and
conditions which govern DAS hereunder. No provision of such agreement shall be construed as
an agreement between RLE and the subcontractors. DAS shall be responsible for the acts or
omissions of any of its subcontractors.

3.11    Manufacturing Warranty. The warranty will be at least for the same period as that
of the third party supplier. Otherwise the warranty will be the standard manufacturer's warranty
of DAS respecting the Equipment is as set out in the Statement of Warranty Policy attached
hereto as Exhibit "D" (the "Warranty"). No other warranties are applicable or may be implied.
The Warranty will be valid for a period of one year (the "Warranty Length Period"). Consumable
parts and components are excluded and shall be noted on all Equipment lists by DAS.

## 4.    DELIVERY AND RETURN

4.1    Shipping and Delivery. DAS will ship all Equipment to RLE Free On Board to
the requested destination. At the time of F.O.B. delivery, DAS agrees to have all packing lists
verified. Partial deliveries shall be permitted only if pre-authorized by RLE. DAS will prepare all
Equipment for shipment in a manner, which is in accordance with good commercial practice,
acceptable to common or special carriers for shipment, and adequate to insure safe arrival. In the
absence of written instructions from RLE, DAS will pack Equipment in a manner consistent with
RLE's usual practices. The costs of packing for shipments of Equipment made in the ordinary
course of business under this Agreement are included in the Manufacturing Price set forth in
Section 2.1 but shall charged to RLE at DAS's cost.

4.2    Right of Inspection; Acceptance and Rejection. RLE shall have the right to
inspect and test the Equipment at the delivery location within ten (10) business days after delivery
before accepting delivery of the Equipment or authorizing payment for such Equipment. Upon
completion of the RLE's satisfactory evaluation of the Equipment after delivery RLE shall
provide written acceptance of the Equipment to DAS. The risk of loss for the Equipment shall be
and remain at the risk of DAS until RLE has provided written acceptance of the Equipment. Any
payment of the Manufacturing Price by RLE shall not constitute an acceptance of the goods, nor
impair the RLE's right of inspection or affect any of its remedies. If there is a shortage in
shipment or the Equipment is found not meet the Technical Specifications, RLE and DAS shall
resolve the rejection such Equipment as described in Section 4.3.

4.3    Rejected Equipment. DAS will promptly replace or correct, at no cost to RLE,
any Equipment which is defective or non-conforming, with a non-defective or conforming
Equipment (as applicable) or, at RLE's option, credit RLE's account for all amounts paid with
respect to the non-conforming or defective Equipment. For purposes of this Section 4.3, non-
conforming Equipment shall be any Equipment that is outside the Technical Specifications as

NP-DAS 00025

agreed to by the parties from time to time as the specifications for the Equipment. DAS shall pay all taxes, transportation and other costs and expenses incurred by RLE in the replacement of any defective or non-conforming Equipment and the risk of loss shall remain with DAS until such non-conforming Equipment is replaced by DAS and accepted by RLE.

4.4     Late Shipping. DAS will pay or reimburse RLE for all excess shipping charges for any late deliveries of Equipment. For the purposes hereof, a "Late" delivery is an actual delivery that is made ten (10) or more business days later than the date confirmed by DAS relative to an Order for Equipment. If a shipment of an Order for the Equipment is late by sixty (60) or more days, then DAS will reimburse RLE the total cost differential incurred by RLE in purchasing substitutable equipment.

5.     TRAINING AND COMMISSIONING OF EQUIPMENT

5.1     Training. DAS shall supply training to orient RLE for the proper use, performance and safe operation of the Equipment. DAS shall provide assistance in vetting potential RLE employees directly involved in operating the Equipment. DAS shall also help RLE to develop operating manuals, operating procedures, safety documentation, and provide training for RLE and DAS employees that construct, install and operate the Equipment. Training shall be conducted at either the DAS or RLE facilities in Phoenix, Arizona per criteria developed and determined by DAS. Field training that may be required, shall be conducted by DAS when mutually agreed.

5.2     Commissioning. DAS shall provide commissioning of the Equipment which will consist of:

5.2.1     functional testing of the Equipment by DAS at its facilities pursuant to Section 3.12. Test results and signoff documentation will be provided by DAS to the RLE.; and

5.2.2     field testing in which DAS will provide one technical representative for start-up assistance of the Equipment for each field operating site.

5.3     Manuals and Documentation. DAS shall provide three copies of all manuals related to the Equipment and one copy of third party manuals, where available, for each piece of Equipment manufactured hereunder. The manuals shall include:

5.3.1     Operation Manuals – these manuals will provide basic operational information sufficient to mechanically operate the Equipment.

5.3.2     Parts Manuals – these manuals will provide illustrations and directions sufficient to identify individual parts and or assemblies as required for repairs or maintenance. All individual parts and/or assemblies will be identified with DAS part numbers.

5.3.3     Service Manuals – these manuals will be limited to DAS designed systems. The intent of manuals will be to provide sufficient information to adequately service or maintain the Equipment. This excludes specific trouble shooting information however, full schematics will be provided to assist in diagnosing problems.

7
**Section 4 - 4.9 a iii) Transactions involving Securities**

5.4     Part and Certification.  DAS will provide RLE with a recommended spares parts list and any applicable certification documents related to the Equipment will be supplied at the time of delivery of the Equipment.

## 6.     RESEARCH AND DEVELOPMENT

6.1     **R&D Contractor.**   RLE agrees to engage DAS during the Term of this Agreement to provide an independent contractor exclusive R&D services in respect of the design, experimentation, engineering, improvement, testing and manufacture, of Equipment and systems related to the Intellectual Property. DAS shall use its best efforts to improving the existing Intellectual Property and Equipment or developing and inventing new Intellectual Property, all of which shall belong exclusively to RLE.

## 7.     FUNDING

7.1     For the purposed of section 7 the term "Financing" shall have the same meaning as ascribed to in the Purchase Agreement;

7.2     Subsequent to the closing date of the Purchase Agreement, RLE agrees to fund the R&D on the Intellectual Property being conducted by DAS on behalf of RLE under this Agreement in an amount equal to twenty (20%) percent, up to a maximum of two million ($2,000,000) dollars, of the first $10,000,000 successfully raised under any Financing by RLE (the "First Tranche"). Thereafter, RLE agrees that it will fund the R&D in an amount equal to ten (10%) percent, up to a maximum of three million ($3,000,000) dollars, of any subsequent Financing successfully completed by RLE over and above the first ten million ($10,000,000) dollars of Financing up to thirty million ($30,000,000) of Financing (the "Second Tranche"). For greater clarification the Purchaser will pay a maximum of five million ($5,000,000) dollars to the Vendor if an aggregate amount of Financings raised is forty million ($40,000,000) dollars. All such funding shall be the R&D expenses of the Purchaser.

7.3     Irrespective of the completion of any Financings by RLE under the First Tranche or Second Tranche RLE will initially provide Funding on a monthly basis through DAS in an amount equal to $65,000.00 CDN per month beginning on the 1st day of the month following the date of closing of the Purchase Agreement, and thereafter payable on the first day of each successive month (the "Monthly Funding"). The Monthly Funding shall terminate upon either of the following events occurring:

7.4     RLE has been unsuccessful in completing a Financing in the minimum amount of $3,000,000 CDN on or before a period of six (6) months from the date of closing of the Purchase Agreement; or RLE advances Funding in the aggregate amount of $400,000 CDN

7.5     Advance of Funding. Other than the Monthly Funding described above, the R&D Funding under the First Tranche or Second Tranche shall be advanced as follows:

7.5.1    Up to the maximum amount under the First Tranche or such lesser amount if less than $10,000,000 is raised, ten (10) days following the closing of such Financing less any Monthly Funding or other payments made previously or advances made by RLE to DAS; and

8
**Section 4 - 4.9 a iii) Transactions involving Securities**

NP-DAS 00027

7.5.2    Up to 25% of the Second Tranche, ten (10) days following the closing of such Financing less any Monthly Funding or other payments made previously or advances made by RLE. to DAS; and

7.5.3    The balance of the Second Tranche as to a further 25% on each of the three (3) successive quarterly periods following the closing of such Financing.

7.6    <u>Records</u>. For the purposes of tax credits or tax audits, DAS shall maintain complete and accurate accounting records, in a form in accordance with generally accepted accounting principles to substantiate all the expenses incurred in the execution of R&D separate from the expenses incurred in the manufacturing supply, training of RLE staff and installation. DAS shall retain such records for a period of two (2) years from the date of expenditure. RLE shall have access (upon reasonable notification) to such records for purposes of audit, during normal business hours, during the term of this Agreement and during the period for which DAS is required to retain such records.

7.7    <u>Inspection and Audits</u>. Subject to the Matriculation, RLE may inspect the R&D facilities or and monitor DAS's performance during the R&D process at any reasonable time. RLE may conduct audits of DAS's quality systems at RLE's sole cost and expense. Subject to the Matriculation, DAS will not refuse RLE's reasonable requests for access to DAS's facilities for the purpose of conducting such audits at any DAS location, provided that all such access shall be coordinated in a fashion so as not to disrupt DAS's business. DAS may take steps to keep DAS trade secrets confidential, and those specific areas of DAS business shall not be accessible to RLE.

## 8.    INTELLECTUAL PROPERTY AND CONFIDENTIALITY

8.1    <u>Confidential Information</u>. DAS acknowledges that Intellectual Property and certain features of the Equipment are trade secrets and proprietary and either have patents pending or patents will be applied for which belong exclusively to the RLE and DAS and its employees and sub-contractors shall not, either during the term of this Agreement or at any time thereafter, disclose any of this information. (the "Confidential Information").

8.2    <u>Definition</u>. Without limiting the generality of Section 8.1, Confidential Information includes, without limitation:

8.2.1    All Technical Specifications, technology and information related to the Intellectual Property related to the Equipment or the R&D;

8.2.2    All information or materials generated or collected by or utilized in the operations of RLE related to the Intellectual Property related to the Equipment or the R&D;

8.2.3    All information or materials provided in connection with or resulting from any task assigned to DAS or work performed by DAS for or on behalf of RLE, including, without limit related to the Intellectual Property related to the Equipment or the R&D;

9

**Section 4 - 4.9 a iii) Transactions involving Securities**

NP-DAS 00028

8.2.4    All technical and schedule details of present and future product development plans related to the Intellectual Property related to the Equipment or the R&D;

8.2.5    All research and development projects of RLE; and

8.2.6    Any information related to the Intellectual Property, Equipment, the R&D the Engineering Product and Innovations.

8.3    Non-Disclosure. DAS shall take such steps as are necessary to ensure that it and its employees and sub-contractors maintain the absolute confidentiality of all such Confidential Information during the term of this Agreement and at all times after the termination or expiration hereof shall not disclose same or permit to be disclosed, or use or permit it to be used, or otherwise obtain any benefit from all or any part of such Confidential Information, except with the express written permission of the RLE. DAS shall not offer consulting services to other parties or services for in the industries applicable to the Intellectual Property. DAS and its employees, consultants and suppliers shall enter into secrecy and non-disclosure agreements in a form satisfactory to RLE.

8.4    Restricted Facilities. In order to facilitate the covenant of confidentiality above, DAS agrees to provide an facilities specifically for the manufacturing of the Equipment and conducting the R&D that has restricted access to other customers of DAS and that DAS will only permit access to such facilities to those employees that will work directly on the Equipment and the R&D for RLE and are subject to the non-disclosure agreements required hereunder.

8.5    Improvements and Inventions. DAS will promptly and fully disclose to RLE all ideas, inventions, improvements, discoveries, creations, designs, materials, works of authorship, trademarks, and other technology and rights (and any related improvements or modifications thereof), regardless of whether patentable, copyrightable, or otherwise protectable under any form of legal protection afforded to intellectual property (collectively the "Innovations"), relating to the R&D and the Equipment of which the DAS its employees, consultants or sub-contractors are aware or becomes aware, that is conceived or developed by DAS its employees, consultants or sub-contractors, alone or with others, during the term of this Agreement, or within five (5) years after the expiration or termination of this Agreement.

8.6    Ownership of Innovations. All such Innovations shall be the sole property of RLE. To the extent possible, such Innovations shall be considered "Works Made For Hire" by DAS for RLE within the meaning of the *Copyright Act* (United States). To the extent the Innovations may not be considered Works Made For Hire, DAS agrees to assign, and automatically does assign to RLE, at the time of creation of the Innovations, without additional consideration, any right, title, or interest DAS may have in such Innovations. DAS will, during and after the expiration or termination of this Agreement, execute such written instruments and do any other acts as may be necessary in the opinion of RLE to obtain a patent, register a copyright, or otherwise protect or enforce RLE's rights in such Innovations. DAS hereby irrevocably appoints RLE and any of its officers as its power of attorney to undertake such acts in its name. The parties agree to co-operate with each other and to provide such information and execute such documents as may reasonably be tendered by the other party to obtain, perfect or maintain the RLE's title to such inventions

8.7    Rights to DAS Inventions and Improvements. Except as provided herein in relation to the Equipment, the R&D, Confidential Information, Engineering Product, and the

**Section 4 - 4.9 a iii) Transactions involving Securities**

NP-DAS 00029

Innovations, RLE shall have no interest, ownership, or right in any DAS invention outside the scope of this Agreement that are not in any way derived from the Intellectual Property or through carrying out the manufacturing and R&D services for RLE described herein.

8.8     Engineering Product. Subject to any application of Section 8.3, DAS agrees that all work product, engineering drawings, schematics, bills of materials, calculations, design notes, software, program, processes, formula, technical analyses, specifications, supplier data, except those that relate to normal third party sub-components, relating to the Intellectual Property, the Equipment and the R&D (the "Engineering Product") is, and will be, the property of the RLE, and upon demand DAS will provide, at no cost, the Engineering Product and any Confidential Information in the care and control of DAS to the RLE, including without limitation, all copies and notes in both paper and electronic or digital form.

8.9     Return of Materials. Subject to any application of Section 8.3, upon the expiration or termination of the Agreement or earlier if requested by RLE, DAS shall promptly deliver to RLE (or its designee) all written materials, records and documents made by DAS or which came into its possession prior to or during the Term of the Agreement concerning the business and affairs of RLE or its affiliates, including, without limitation, all materials containing or related to the Intellectual Property, the Equipment, the R&D, Confidential Information, Innovations and Engineering Product.

8.10     Disclaimer. Except for the IP Licence, nothing contained in this Agreement shall be construed or interpreted, either expressly or by implication, estoppel or otherwise, as: (i) a grant, transfer or other conveyance by RLE to DAS of any right, title, license or other interest of any kind in any of its Intellectual Property or any improvements thereon or inventions therefrom, (ii) creating an obligation on the part of RLE to make any such grant, transfer or other conveyance or (iii) requiring RLE to participate with DAS in any cooperative development program or project of any kind or to continue with any such program or project.

8.11     Change of Control. Should the ownership or control of DAS change or DAS sell all or substantially all of its assets, all documents (hard copy or electronic form) relation to the Intellectual Property, the Equipment, the R&D, Confidential Information, Innovations and Engineering Product. shall be placed in escrow by DAS with the RLE's solicitor, prior to transfer of ownership and/or control.

8.12     Injunction. In the event that DAS is found by a Court in the Province of Alberta to be in breach of any of the covenants set out in Section 8.1 through 8.11 herein DAS acknowledges that such breach will cause irreparable harm to RLE which cannot be adequately compensated solely by damages and the RLE is entitled to seek, in addition to other remedies it may have, injunctive relief or specific performance to prevent such continued breach by DAS. Enforcement of any injunction or specific performance will not be the basis for determining damages. Any specific damages that may arise from the breach of any of the covenants set out in Section 8.1 through 8.11 herein would be determined by a Court in the Province of Alberta.

8.13     Matriculation of Intellectual Property and Manufacturing Rights.     It is acknowledged by both parties to this Agreement that specific Equipment to be manufactured by DAS for RLE and certain Intellectual Property are subject to a staged release and delivery to RLE to maintain the secret and propriety nature thereof (the "Matriculation") as described in the Share Purchase Agreement and as set out in Exhibit C, ("Matriculation Schedule"), which includes, among other things:

**Section 4 - 4.9 a iii) Transactions involving Securities**

NP-DAS 00030

      8.13.1   DAS shall have the exclusive license to manufacture the Equipment until such date when RLE shall have the right to manufacture or have third parties manufacture the Equipment of its components as described in the Matriculation Schedule;

      8.13.2   The Trade Secrets shall be released to RLE as described in the Matriculation Schedule such that RLE can manufacture the Equipment and make full functional use of the Intellectual Property and Equipment; and

      8.13.3   DAS agrees to assist and train RLE in the manufacture of Equipment related to the Intellectual Property as described in this Agreement, the Matriculation Schedule and the Share Purchase Agreement.

    8.14   <u>Survival</u>. The provisions contained Section 8 shall survive the expiration or termination of this Agreement.

## 9.    TERM AND TERMINATION

    9.1   <u>Term</u>. This Agreement is effective as of the Effective Date and shall expire on April 1, 2014 (the "Term") unless this Agreement is terminated as provided in this Section 8. The Term shall renew for additional one (1) year periods if the parties so agree in writing at least six (6) months prior to the expiration of the Term or any renewal term.

    9.2   <u>Termination</u>. RLE may terminate this Agreement prior to the expiration of the Term (including any renewal term) upon the occurrence of one of the following events of default:

      9.2.1   effective immediately upon written notice by the non-bankrupt party, if the other party (i) files a petition in bankruptcy, (ii) is adjudicated bankrupt, (iii) becomes insolvent, (iv) makes an assignment for the benefit of creditors, (v) is voluntarily or involuntarily dissolved, or (vi) has a receiver, trustee or other court officer appointed for its property;

      9.2.2   DAS commits a material default or breach of its obligations, covenants, or representations or warranties hereunder RLE has provided written notice of such material default or breach to DAS; or

      9.2.3   effective immediately upon the death or incapacity of Danzik.

    9.3   <u>Curative Provision</u>. Notwithstanding the DAS commits a material default or breach as set out in section 9.2.2, from the date of RLE's notice of default or breach DAS shall have thirty (30) **days** in which to provide RLE a reasonable plan to remedy the default or breach (the "Remedy Plan"). RLE shall act reasonably in determining if such a breach or default has occurred. Following the date that DAS provides RLE with the Remedy Plan, DAS shall have an additional (60) sixty calendar days to remedy the breach or default using reasonable commercial means. An extension may be granted in such cases where DAS has commenced a cure but has not completely cured the material breach or default by the end of such sixty (60) calendar day period.

    9.4   The pricing in effect during the sixty (60) day period following notice of termination pursuant to this Section 9 shall be the same as the pricing in effect immediately prior to such notice of termination

**Section 4 - 4.9 a iii) Transactions involving Securities**

NP-DAS 00031

9.5     Effects of Termination.  Termination will not relieve or release either party from making any payments which may be due and owing under the terms of this Agreement. Expiration or termination of this Agreement will not relieve the parties of any obligations accruing prior to such expiration or termination, and the provisions of Sections 2.6 (Taxes), 8 (Intellectual Property and Confidentiality), 9.3 (Effects of Termination), 9.4 (Termination of Matriculation) 10 (Indemnities and Insurance), and 11 (General Provisions) will survive such termination.

9.6     Termination of Matriculation.  If this Agreement is terminated pursuant to either Section 9.2.2 or Section 9.2.3, then the Matriculation shall immediately terminate and DAS shall be obliged to provide specific direction, supervision and instruction (both written and demonstrative) to the manufacture of such components and Equipment related to the Intellectual Property in a timely manner which permits RLE to have the full functional and proper ability to manufacture all components and Equipment related to the Intellectual Property.

## 10.    INDEMNITIES AND INSURANCE

10.1     Indemnity. DAS agrees to unequivocally and unconditionally indemnify the RLE from and against any loss arising from claims against the RLE, its subsidiaries, its affiliates and their respective officers, directors, agents and servants (each, an "RLE Indemnified Party") against any and all liability, loss, expense, damage, claim, licence and encumbrance including legal expenses (on a solicitor and client basis) or other expenses of any kind or nature whatsoever, imposed on or assumed by, or incurred by or asserted against, an RLE Indemnified Party in any way relating to or arising out of: (i) any breach of DAS's representations, warranties, covenants or obligations under this Agreement; (ii) the negligence or misconduct by DAS in the performance of, or DAS's failure to perform, its obligations under this Agreement; or (iii) any unlawful use by DAS or a third party of the Intellectual Property, Equipment, Confidential Information, Engineering Product, or Innovations; unless in each case such claims have been finally determined by a court of competent jurisdiction to have been caused by an RLE Indemnified Party's gross negligence or willful misconduct the manufacturing or R&D performed by DAS for RLE or in defending or prosecuting any suit, action or other proceeding brought in connection therewith or in obtaining or attempting to obtain a release from liability in respect thereof, whether or not it be claimed or proven that there was negligence or breach of common law or statutory duty or both.

10.2     Insurance. DAS agrees to procure and maintain at its own cost and expense, commercial general liability insurance for personal injury and property damage with at least coverage in the minimum amount of $5,000,000 Such insurance policy shall name RLE as additional insured with respect to the indemnification required under Section 10.1 and contractual liability endorsement covering all obligations which DAS has assumed under this Agreement. This insurance coverage shall be primary and non-contributory to any other insurance afforded to any other of the named insured.  At any time upon request, DAS shall provide to RLE a certificate(s) of insurance as evidence that the required insurance is in effect and providing further that no policy will be canceled or amended to reduce the amount of coverage or to eliminate coverage without thirty (30) days' prior written notice to RLE.

10.3     Survival. The limitations of liability and indemnities contained in this clause shall survive the expiration or termination of this Agreement.

## 11.    GENERAL PROVISIONS

13
**Section 4 - 4.9 a iii) Transactions involving Securities**

11.1     <u>Governing Law/Forum.</u>   This Agreement shall be construed and the legal relations between the parties determined in accordance with the laws of the Province of Alberta, without giving effect to any choice of law rules which may direct the application of the laws of any other jurisdiction.  Both parties hereby consent to the exclusive jurisdiction of the Courts of the Province of Alberta and expressly waive any objections or defense based upon lack of personal jurisdiction or venue.  The prevailing party shall be entitled to recover its costs and reasonable legal fees and expenses incurred in connection with any action or proceeding between DAS and RLE arising out of or related to this Agreement.

11.2     <u>Entire Agreement/Severability/Invalid Provisions.</u>  This Agreement embodies the entire understanding of the parties hereto on the subject matter hereof, and supersedes any previous agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof.  In the event of any inconsistency between the terms of this Agreement and the terms of any Exhibit to this Agreement, the terms of this Agreement shall govern and control.  If any part, term, or provision of this Agreement shall be held illegal, unenforceable, or in conflict with any law of a federal, provincial, or local government having jurisdiction over this Agreement, the validity of the remaining portion or portions of this Agreement shall not be affected thereby.

11.3     <u>Assignment.</u>  DAS shall not assign this Agreement without the written consent of RLE, this shall not unreasonably withheld. RLE may assign this Agreement to an affiliate, to a successor to the business or operation of RLE or any affiliate, or to any other party that agrees to be bound by all terms and conditions of this Agreement.  RLE's affiliates, which affiliates, as third party beneficiaries of this Agreement, shall enjoy and be entitled without restriction or additional consideration to all of the rights and privileges accruing to RLE hereunder; provided, that RLE agrees that it shall remain fully responsible for the performance and fulfillment of all its obligations set forth herein

11.4     <u>Enurement.</u>  This Agreement shall be binding upon the parties hereto and shall enure to the benefit of the parties hereto, their respective successors and assigns, subject to Section 11.3.

11.5     <u>Force Majeure.</u>   Neither party hereto shall be liable to the other for nonperformance caused by the following factors which are beyond such party's direct control: (i) natural disaster or other "Acts of God", (ii) riots, wars or insurrections or (iii) actions of any governmental agency, including rules, laws, orders, regulations and restrictions (collectively, "Force Majeure Events").  Strikes and labor disputes shall not constitute a Force Majeure Event.  Any party invoking this section shall give prompt written notice to the other party of such Force Majeure Event and take reasonable steps to remove or cure such Force Majeure Event.  RLE shall be entitled to suspend its payments for any Equipment not received by RLE until such Force Majeure Event is removed and DAS is able to resume delivery of Equipment and services hereunder.

11.6     <u>No Agency.</u>  Neither party shall have any right, power, or authority to assume, create, or incur any expense, liability, or obligation, express or implied, on behalf of the other party, except as expressly provided herein.  This Agreement is not intended to be nor shall it be construed as a joint venture, association, partnership, or other form of a business organization or agency relationship.

11.7     <u>No Waiver.</u>  The waiver of a breach of this Agreement or the failure of a party to exercise any right under this Agreement shall in no event constitute a waiver as to any other

NP-DAS 00033

breach, whether similar or dissimilar in nature, or prevent the exercise of any right under this Agreement.

11.8    Publicity/Use of Name.   DAS shall not use the name of RLE or any of its affiliates or refer directly to RLE or its affiliates in any media, public announcement or public disclosure, including promotional or marketing material or websites, without prior written approval from RLE.  RLE shall not use the name of DAS or any of its affiliates or refer directly to DAS or its affiliates in any media, public announcement or public disclosure, including promotional or marketing material or websites, without prior written approval from DAS.

11.9    Notices.   Any notice, request, instruction, or other document deemed by RLE or DAS to be necessary or desirable to be given to the other party hereto shall be in writing and shall be faxed, delivered by messenger, air courier, or mailed by certified mail, postage prepaid, with return receipt requested, to the following addresses:

<div style="margin-left:2em">

If to RLE:         Ridgeline Energy Services Inc.
                   3016 19 Street NE
                   Suite 200
                   Calgary, Alberta
                   Canada T2E 6Y9
                   Attn: Chief Executive Officer
                   Fax:  (403) 806-2381

If to DAS:         Danzik Applied Sciences, LLC
                   15111 North Hayden Road
                   Suite 160-302
                   Scottsdale, AZ 85260
                   Attn: Dennis M. Danzik
                   Fax:

</div>

Notwithstanding the foregoing, DAS's invoices to RLE may be sent by ordinary mail.   The addresses set forth above may be changed by notice given in accordance with this Section 11.9.

11.10   Headings.   Headings used in this Agreement are for reference purposes only and shall not be used to modify the meaning of the terms and conditions of this Agreement.

11.11   Modification: Amendment.   This Agreement, including all Exhibits attached hereto, may be amended or modified only by an instrument signed by duly authorized representatives of the respective parties.

11.12   Counterpart.  This Agreement may be executed in counterparts including by facsimile or electronic scan and each party executing a counterpart shall be deemed a party to this Agreement as if the signatures of all parties were endorsed on the same copy of this Agreement.

*The balance of the page is intentionally left blank*

<div style="text-align:center">

15

**Section 4 - 4.9 a iii) Transactions involving Securities**

</div>

NP-DAS 00034

11.13  Binding Effect.  The parties represent and warrant to each other that the execution, delivery and performance of this Agreement will not cause them to be in breach or violation of any other agreement to which they are a party or by which they are bound.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives to be effective as of the date written above.

RIDGELINE ENERGY SERVICES INC.

Per: _____

Tony Ker
Chief Executive Officer

DANZIK APPLIED SCIENCES, LLC

Per: _____

Dennis M. Danzik
Managing Member

16

NP-DAS 00035

EXHIBIT A

INTELLECTUAL PROPERTY

## WATER INTELLECTUAL PROPERTY

1.      All Intellectual Property and Equipment that is owned by RLE or otherwise related to or connected with the following technologies:

   A.      A method to control electrolysis and shock diffusion for the reactive production $H_2$ and O in water and other fluids containing water for collection of valuable contaminants, and remediation of the water or fluid itself to a desired state. [NTD: Does this cover the power supply conditioner as it related to the water treatment facilities?]

   B.      An extremely low energy hydrodynamic electrolytic reactor designed to control catalysis through the use of flow rate and energy consumption.

   C.      A hydrodynamic gravitational system for the treatment, recycling and production of a water product from waste water sources incorporating electrolytic catalysis to produce ultra violet radiation and enhance the multi point production of $O_3$ and $H_2$ in water.

   D.      A power supply technology for the purpose of the providing the type of electrical conditioned power needed to operate the water treatment process. This may include power from generators and or direct grid power supply.

   Which includes without limitation: (i) The worldwide rights to all water based Intellectual Property and improvements thereon; (ii) water treatment processes applied to the oil and gas industry and more specifically, frac and produce water processing, Oil sands water processing SAGD, tailings or any part of the water used in these processes, leachate water processing; and (iii) standing water processing

## ENERGY INTELLECTUAL PROPERTY

1.      All Intellectual Property and Equipment that is owned by RLE or otherwise related to or connected with the following technology:

   A.      The fuel technology that uses a stepped pressure process and used the inherent qualities of both vegetable oil and petroleum based oils from pure or waste sources as petroleum fuel dilatant and therefore extends the more expensive fuel with a less expensive combustible fuel additive for biofuels.

   Which includes without limitation: The worldwide rights energy based technologies described above and all improvements thereon; and (ii) all renewable fuel technology from electrocatalytic process [NTD: This description should be confirmed]

NP-DAS 00036

**EXHIBIT B**

**EQUIPMENT AND TECHNICAL SPECIFICATIONS**

18
**Section 4 - 4.9 a iii) Transactions involving Securities**

NP-DAS 00037

## EXHIBIT C

## MATRICULATION

The following is an excerpt from the Share Purchase Agreement and sets out the general terms and conditions of the Matriculation. In this Exhibit C the capitalized terms shall have the meaning set out in the Share Purchase Agreement

a) The release of the Trade Secrets shall be based on the following dates or events:

   i) On April 1, 2012 – The release from the IP Escrow Agreement of all Intellectual Property and Trade Secrets related to the trigger assemblies related to the Assets;

   ii) On April 1, 2013 – The release from the IP Escrow Agreement of all Intellectual Property and Trade Secrets related to the reactor vessels related to the Assets;

   iii) On April 1, 2014 – The release from the IP Escrow Agreement of all Intellectual Property and Trade Secrets related to the reactor cores and generator assemblies related to the Assets;

   iv) In the event of an uncured breach of DAS under the this Agreement or a termination of this Agreement as a result of an act or omission by DAS, all Trade Secrets shall be immediately released from the IP Escrow Agreement and DAS shall be obliged to provide specific direction, supervision and instruction (both written and demonstrative) of the use and operation of the Trade Secrets in a timely manner which permits the Purchaser to have the full functional and proper use the Assets acquired hereunder; and

   v) In the event of the death or incapacity of Trustee, all Trade Secrets shall be immediately released from the IP Escrow Agreement and DAS shall be obliged to provide specific direction, supervision and instruction (both written and demonstrative) of the use and operation of the Trade Secrets in a timely manner which permits the Purchaser to have the full functional and proper use the Assets acquired hereunder;

b) The manufacturing of the equipment or components that comprise all or part of the Assets shall also be subject to Matriculation and during the Matriculation period DAS shall have exclusive manufacturing rights, subject to the provisions of the Development and Supply Agreement. The transfer of the manufacturing exclusivity from DAS shall be based on the follow following dates or events:

   i) On April 1, 2011 – Purchaser shall be entitled to directly manufacture the trigger assemblies related to the Assets;

   ii) On April 1, 2012 – Purchaser shall be entitled to directly manufacture the reactor vessels related to the Assets;

   iii) On April 1, 2013 – Purchaser shall be entitled to directly manufacture the reactor cores and generator assemblies related to the Assets;

19
**Section 4 - 4.9 a iii) Transactions involving Securities**

NP-DAS 00038

iv) In the event of an uncured breach of DAS under the Development and Supply Agreement or a termination of Development and Supply Agreement as a result of an act or omission by DAS, the Purchaser shall be entitled to directly manufacture all components and equipment related to the Assets, and DAS shall be obliged to provide specific direction, supervision and instruction (both written and demonstrative) to the manufacture of such components and equipment related to the Assets in a timely manner which permits the Purchaser to have the full functional and proper ability to manufacture all components and equipment related to the Assets;

v) In the event of the death or incapacity of Dennis M. Danzik , the Purchaser shall be entitled to directly manufacture all components and equipment related to the Assets, and DAS shall be obliged to provide specific direction, supervision and instruction (both written and demonstrative) to the manufacture of such components and equipment related to the Assets in a timely manner which permits the Purchaser to have the full functional and proper ability to manufacture all components and equipment related to the Assets; and

vi) Unless the Purchaser becomes entitled to the full manufacturing ability under subsections b) (iv) or (v), the Purchaser shall not subcontract the manufacturing of equipment or components relating to the Assets for a period of seven (7) years from the Date of Closing, unless such components are not related to, or require knowledge of, the Trade Secrets.

**Section 4 - 4.9 a iii) Transactions involving Securities**

NP-DAS 00039

## EXHIBIT "D"

### STATEMENT OF WARRANTY POLICY

1.      DAS warrants the Equipment to be free from defects in material and workmanship for a period of one (1) year.

2.      DAS reserves the right to inspect the Equipment to determine the validity of the warranty claim and if determined to be valid, DAS will, at its option: (1) replace the defective Equipment or parts thereof; or (2) authorize the Equipment or part to be returned to DAS's facility for repair; or (3) authorize the Equipment or part to be repaired at RLE's facility.

3       RLE agrees to advise DAS, in writing, prior to any retrofitting or additions to the Equipment during the DAS warranty period. Failure by the RLE to do so shall immediately render the DAS warranty null and void for that piece of Equipment that was retrofitted or modified.

4.      Repair or replacement will be without charge, but removal and installation of other parts, including additional parts furnished, will be made at RLE's expense. No charges will be accepted for returns, repairs or alternations done by the RLE unless previously authorize in writing by DAS.

5.      RLE acknowledges that the Equipment is of a size, design and type requested by the RLE and agrees that, except as stated herein, there are no other warranties, express or implied, including those of merchantability, which DAS hereby disclaims.

NOT COVERED UNDER THIS WARRANTY

1.      Equipment or parts manufactured by others however, DAS will assign the benefits of any manufactures' warranty if assignable.

2.      Equipment or parts that are or have been in contact with corrosive chemicals or corrosive materials.

3.      Equipment or parts customarily subject to wear.

4.      Failure resulting from improper use or inadequate maintenance.

**Section 4 - 4.9 a iii) Transactions involving Securities**

NP-DAS 00040